THE STATE OF OHIO, APPELLEE, *v.* HARRIS, APPELLANT.

(No. 75-843—Decided December 27, 1976.)

Mr. *George Smith*, prosecuting attorney, and Mr. *Alan C. Travis*, for appellee.

Mr. *Myron Schwartz* and Mr. *Timothy Gerrity*, for appellant.

CELEBREZZE, J. Initially, appellant takes issue with the trial court's denial of the motion to suppress his statements. Counsel for appellant argues that his telephone call to an unnamed member of the Philadelphia Police Department requesting that no interrogation take place without a lawyer present, coupled with his unilateral acclamation that he had previously advised his client not to make any statements, is sufficient to exclude appellant's statements. Counsel attempts to buttress this argument with appellant's age at the time of the interrogation, 17 years and 9 months, a fact which, by counsel's own admission in the record, was unknown to him. This court stated in paragraph one of the syllabus of *State* v. *Stewart* (1964), 176 Ohio St. 156, that "[a] person who is less than 18 years old is not legally incapable of making a voluntary confession."

We accede to appellant's argument that an accused has a constitutional right to counsel, particularly at that stage of the investigation, however this is a right that can be waived. Even given appellant's age, no insurmountable barrier is constructed to a waiver of that right. (See *State* v. *Carder* (1966), 9 Ohio St. 2d 1, where the defendant was one year younger than appellant and his confession was ruled admissible.)

Appellant argues that the testimony involving the giv-

ing of the *Miranda* constitutional rights does not coincide with the facts in this case.

The record discloses the contrary. Detective Tom Jones of the Columbus Police Department who saw the appellant shortly after his arrest in Philadelphia and testified as follows:

"Q. Now, Officer, I'll hand you what's previously been marked for purpose of identification as State's Exhibit 41, and I'll ask you to look at that if you would please. Now, Detective Jones, I'd like to hand you again take a look at what's been marked for purpose of identification, State's Exhibit 41, have you ever seen that exhibit before, sir?

"A. Yes, sir, I have.

"Q. Would you tell the court when you saw it?

"A. I saw this interview sheet at approximately 1:00 A. M. on the 14th day of May in Philadelphia, Pennsylvania.

"* * *

"* * * Now, was that read to this Defendant, John Harris in your presence?

"A. Yes, sir, it was.

"Q. And, then also on that page there are questions, can you read and write and things of this nature and answers yes or no, was that read in your presence?

"A. Yes, sir, it was.

"Q. Now, specifically on page 2, there are some seven typed questions. The first one reads that do you understand that you have the right to keep quiet and not—and do not have to say anything at all underneath that is written in ink the word, yes. Question number two, do you understand that anything you say can be used against you. Underneath that is written the word, yes. Three, do you want to remain silent. Underneath that is written, the word, no. Four, do you understand that you have the right to talk with a lawyer before we ask you any questions. Underneath that is written yes. Five, do you understand that if you cannot afford to hire a lawyer and you want one, we will not ask you any questions until a lawyer is appointed for

you free of charge. Underneath that is written in ink, yes. Six, do you want to talk with a lawyer at this time, or to have a lawyer with you while we ask you questions. Underneath that is written in ink, no. And, seven, are you willing to answer questions of your own free will, without force or fear and without any threats or promises having been made to you. Underneath that is written in ink is yes. Typed under that is statement of, and written in ink, is the name of John William Harris and the date 5-14-74. Now, the questions I have just read and appear typed on page two in State's Exhibit 41, were you present when those questions were read to John Harris?

"A. Yes, sir, I was.

"Q. Were you present when those questions were read to John Harris?

"A. Yes, sir, I was.

"Q. And the answers, whatever they may be, yes or no, were those answers written in your presence by the Defendant, John Harris?

"A. Yes, sir, it was.

"Q. And, the name, John William Harris, and the date, 5-14-74, was that signed by the Defendant in your presence?

"A. Yes, sir."

These questions and answers relative to appellant's educational and literal background are from State's Exhibit 41:

"Q. Can you read and write the English language, by that I mean can you read a newspaper without any trouble?

"A. Yes, I can.

"Q. How far did you go in school?

"A. I finished the 11th grade at Eastmoor Sr. High, in Columbus, Ohio.

"Q. Do you know why you have been arrested?

"A. Yes I do for the death of that woman and for rape."

Detective Jones testified further that he saw the appellant again, some three hours later, at which time he again advised appellant of all his rights, permitted him to

read them, and asked him if he understood them or had any questions concerning them. Appellant acknowledged his understanding and again affixed his signature. It was at this time that the following took place:

"Q. Would you tell the court if you requested him to do anything?

"A. Yes, sir, I asked him, after I advised him of his rights, if he'd be willing to write out the truth on his involvement in this homicide.

"Q. That's the only question that you asked him at that point?

"A. He said he would, right.

"Q. Did you procure any in any form by pencil and paper?

"A. Yes, sir.

"Q. Did you give it to him?

"A. Yes, sir.

"Q. And, then after you gave this to Mr. Harris, what if anything, did you do?

"A. Mr. Harris was in a room. I left the room. I proceeded maybe four or five feet from the doorway. I asked him if he would write this out, he stated he would. At this time, he began writing out his statement.

"Q. And, you had left the room, is that correct?

"A. That's right."

Appellant wrote, and the trial court admitted, the following:

"*On the Night it happen*

"Me and Jerome and Black and Legs went out to try to fine a ride because some Body had sold them some bad dope. and it was not any good. And they wanted to get there money back.

"So we the four of us went to see if we could get us a ride to go and find the man that sold the dope. So we went walking them and happen to run by St. Anthony hospiale into the lady that was killed. Jerome went up to her car and knocked on the window with a gun and the lady open the door and he told her to get in the back. And she

said that she did not won't to do as he said but After a few words with her she got in the back set of her car. then we road around thinking of what to do with her. I my self drove the car and were I had took them they did not like the spot so we to a spot behind my house. Were Three of us had sex with the lady. Then Jerome & Black & Legs went to try and find the man that sold them the dope and when they were gone I took the lady to my house until they got back with the car and when Jerome came back the outher tow were not in the car. So we went to their house. and Jerome said that he wanted to kill the lady. So we took the lady to some woods were by Sunbury Rd. Jerome shot the lady and then I shot her and then we left to go take the tires off of the car and there was another dude they call beast. I left out something because he had sex with the lady to. So the dude named beast let me drive his car and Jerome drove the ladys car to a spot were we could take the tires off. beast said that he wanted 3 of the tires for his car. And we gave him all of them. Then the next thing we know was that he had taken some Master Cards and tride to by some rings with them that is what we herd on the T. V. and they found out were he live at. and then we herd that the police were looking for us so we got some dude to bring us up here. And we got cot. And that my side of the story. Taylor Clark bought us to Philadelphia in his car and drop us off.

"The abobe statement are the truth

"I have not been threatened

"I made these statement my self under my one free will."

While the foregoing may cause the elevation of some professorial eyebrows over its prose, syntax and even grammar, the simple, clear, chronology of its grisly content is adequately related without any of the embellishments of academia.

Appellant cites the following cogent language from the case of *Coyote* v. *United States* (C. A. 10, 1967), 380 F. 2d 305, 308, to support his argument:

358

"What *Miranda* does require is meaningful advice to the unlettered and unlearned in language which he can comprehend and on which he can knowingly act. We will not indulge semantical debates between counsel over the particular words used to inform an individual of his rights. *The crucial test is whether the words in the context used, considering the age, background and intelligence of the individual being interrogated, impart a clear, understandable warning of all of his rights."* (Emphasis added.)

We are convinced that the appellant was advised concerning his rights by his counsel prior to his arrest; that appellant was fully advised by the police at least two times prior to the statements; and that the spirit and meaning of the foregoing quotation was fully complied with. There is nothing in the record to indicate otherwise.

Appellant argues further that the enactments of the Ohio General Assembly which provide for the death penalty violate the rule set down by the United States Supreme Court in *Furman* v. *Georgia* (1972), 408 U. S. 238, and are unconstitutional under the cruel and unusual punishments clause of the Eighth Amendment to the United States Constitution. This argument has previously been resolved by this court in the case of *State* v. *Bayless* (1976), 48 Ohio St. 2d 73, and that ruling is adhered to.

Appellant contends that the manner in which indictments are brought provides for an unregulated level of prosecutorial discretion. Appellant sought to prove this premise at his trial by calling several witnesses, including two assistant county prosecutors. However, the record discloses no abuse of prosecutorial discretion by selective prosecution or discrimination against an indivdual defendant on a constitutionally impermissible basis. Counsel's reliance upon *Furman, supra,* in support of this contention is misplaced. That case condemned only the unfettered or uncontrolled sentencing discretion prevalent in death penalty statutes at that time.

Counsel maintains further that the Eighth Amendment precludes the application of the death penalty and the discretion of a juvenile judge in a transfer hearing pursuant

to R. C. 2151.26. This proposition is rejected.

Counsel cites the case of *Commonwealth* v. *A Juvenile* (1973), 364 Mass. 103, 300 N. E. 2d 439, in support of his contention that a juvenile may not constitutionally be sentenced to death. This case involved a Massachusetts statute which provided that as to a juvenile tried as an adult and found guilty, if still under age 18 at the time of sentencing, the trial court had an absolute, uncontrolled discretion to still adjudicate the defendant a delinquent child. The court found the uncontrolled sentencing discretion constitutionally impermissible, not the application of the death penalty to a person under 18. The Ohio statutes contain no similar provision. We conclude that the death penalty, where applicable, applies even-handedly to adults and juveniles tried as adults.

Appellant next argues that his due process rights were violated by the trial court in failing to determine whether his waiver of a jury trial and election of a three judge panel was knowingly, intelligently and voluntarily made. Although neither side disputes the right to waive a jury trial (see *Patton* v. *United States* [1930], 281 U. S. 276), the question is the manner in which that objective is accomplished. This issue was initially raised by the motion for a new trial when it was discovered that the written waiver of a jury trial was not in the court's file. The record shows that both counsel for appellant assumed that the other had obtained a written waiver. Attorney Schwartz, one of the defense counsel, in acknowledging the court's recollection of a pre-trial hearing concerning advising the assignment commissioner if there was to be a change requiring a jury venire stated, "No, there was no change in his mind."

At the hearing on the motion for a new trial, the court and counsel viewed a video tape involving the waiver. When it was concluded a member of the court said, "Well, the court did explain it. Stated to him, 'You have a right to trial by a jury.'" To which Schwartz responded: "That's the question this court has to decide." And the court replied: "And he waived this."

In addition to the pre-trial waiver, counsel for appellant again acknowledged appellant's desire to waive a jury

trial in his opening statement. The video tape also reflects that counsel, in addition to the judge, advised the appellant of his right to a jury trial.

The court discovered the absence of the written waiver on that same day, but after it had returned its verdict. On that day, September 27, 1974, at that time, the appellant signed the waiver in open court.*

The accepted standard for waiver of a constitutional right is an intentional relinquishment of that right. (See *Johnson* v. *Zerbst* [1938], 304 U. S. 458.) However there is no constitutional requirement that the waiver be in writing. Only, that it must be knowingly and intelligently made. (See *United States* v. *Ricks* [C. A. D. C. 1973], 475 F. 2d 1326.)

To resolve this question, we must look to Crim R. 23 (A) which contains the following language:

"In serious offense cases, the defendant before commencement of the trial may *knowingly, intelligently* and voluntarily waive in writing his right to trial by jury. Such waiver may also be made during trial with the approval of the court and the consent of the prosecuting attorney. * * *" (Emphasis added.)

In the *Ricks* case the corresponding Federal Rule of Civil Procedure 23 was interpreted as being procedural; and where the record clearly reflected a knowing, intelligent waiver by the accused, the lack of a written waiver did not upset the conviction. We accept this interpretation and hold that its application to this case and Crim. R. 23 (A), is parallel. The record in this case shows that from its pre-trial stage through the verdict it was clear that appellant and both of his counsel desired to waive a jury trial and submit the case to a panel. An entry dated September 9, 1974, almost two weeks prior to trial, by the administrative and presiding judge of the general division of the Franklin County Common Pleas Court, notes the appellant's waiver of a jury trial and makes the appointment of a three judge panel. That choice was not deviated

*Documents 28 and 31 in record as certified by Clerk of Common Pleas Court.

from even after the verdict of guilty as charged was returned and the absence of a written waiver discovered. At that time, appellant reaffirmed his waiver by executing the written form that was countersigned by his counsel.

.This court accedes that the better practice is to obtain a written waiver after fully advising a defendant of his right to a jury trial and accepting his "knowingly, intelligently, and voluntarily" made oral waiver on the record. However, the undisputed facts in this case militate against any error which the failure of said practice may create.

We are in agreement with appellee that "to reverse this conviction on such a narrow, hypertechnical point" would not be justified by reason or logic.

Appellant urges next that he did not receive a fair trial since all three of the judges did not participate in resolving questions of law presented at the trial. He argues that the presiding judge exercised complete dominion over objections raised by counsel during the course of the trial. Although the record discloses that one of the judges questioned his role in the proceedings, there is nothing to substantiate appellant's contention. There is no showing that at least a majority of the judges did not concur on all matters of law and fact. While the presiding judge frequently expressed the collective ruling of the court, the record discloses each of the other judges expressing both the view of the entire panel or his individual conclusion. In no instance, however, is there evidence of less than a majority concurring on a given ruling. All rulings reduced to writing were signed by the entire panel. We are unable to find any irregularity in connection with appellant's contention.

Finally, appellant maintains that the trial court erred by its failure to find that the offense was primarily the product of his mental deficiency under R. C. 2929.04(B)(3), which would have precluded the death penalty. It is significant to note at this juncture that there has been no complaint lodged at any time concerning the rejection of appellant's belated plea of not guilty by reason of insanity.

Defense counsel apparently elected to assert the full thrust of this contention at the mitigation hearing.

R. C. 2929.04(B) states, in pertinent part:

"Regardless of whether one or more of the aggravating circumstances listed in division (A) of this section is specified in the indictment and proved beyond a reasonable doubt, the death penalty for aggravated murder is precluded when * * *

"* * *

"(3) The offense was primarily the product of the offender's psychosis or mental deficiency, though such condition is insufficient to establish the defense of insanity."

Counsel submits that appellant was a recognized sociopath according to the doctors who examined him as well as by the two lower courts that passed judgment on him. We agree with this conclusion. However, we do not equate "sociopath" as being either a psychosis or a mental deficiency.

Both appellant and appellee refer to the American Psychiatric Association's Diagnostic and Statistical Codes for APA-ICDA Mental Disorders (2 Ed. 1971) to define and categorize the term "sociopath." The Codes list the antisocial personality under the category: Personality Disorders and Certain Non-Psychotic Mental Disorders. The reports of the examining psychiatrists appointed by the court pursuant to statute reveal no evidence that appellant was psychotic or suffered from any mental derangement.

Dr. Charles W. Harding concluded his report with the following:

"In conclusion I see no evidence of any psychosis or mental derangement, but consider him a sociopathic personality which in itself says that he has a lack of inhibitive personality traits exhibited by the average person. If drugs were used the inhibitive factors would be still less. His behavior during and following the alleged acts reveals evidence that he was aware of the nature of his acts and the probable consequences."

Dr. John H. Vermeulen stated:

"It is my opinion that John is not psychotic or mentally deficient, nor was he so at the time of the offense, in the meaning that is usually given to these terms. Being in touch with reality he is not psychotic. A diagnosis of anti-social personality usually is exclusive of mental illness, but his lack of feeling and the absence of a functioning conscience are to me indicative of a severe characterological defect. Again, borderline or low to average IQ are levels of intelligence above that of mental deficiency. * * *"

During the course of the trial a clinical psychologist testifying on behalf of the appellant attempted to establish that the acts of appellant were the result of a combination of drug and alcohol abuse. Unfortunately, there is no evidence to support that conclusion. Rather, the continuous thread woven throughout this case involves the search for some unknown person who had on some previous date sold some low content drugs to appellant and his friends. Nowhere in this record can it be established that appellant was under the influence of drugs on the night of May 8, 1974, and we wish to emphatically state this conclusion.

Based upon the reports and the entire record in this case we must agree with the previous conclusions of the trial court, as affirmed by the Court of Appeals, that there is no evidence of psychosis or mental deficiency of the appellant at the time of the commission of the crime. No mitigating circumstance as set forth in R. C. 2929.04(B) has been established by a preponderance of the evidence.

The judgment of the Court of Appeals is affirmed.

*Judgment affirmed.*

O'NEILL, C. J., HERBERT, CORRIGAN, STERN, W. BROWN and P. BROWN, JJ., concur.