IN RE BARNES.

(No. 85AP-1019 — Decided April 29, 1986.)

*Connor & Koltak Co., L.P.A.,* and

*Daniel D. Connor,* for appellant Keith D. Barnes, Ph.D.

*Anthony J. Celebrezze, Jr.,* attorney general, and *Laurel D. Blum,* for appellee.

BLACK, J. Pursuant to R.C. 119. 12, plaintiff-appellant, Keith D. Barnes, Ph.D. ("Dr. Barnes"), appeals from a judgment of the Franklin County Court of Common Pleas affirming the order of the Ohio State Board of Psychology ("the board"), defendant-appellee, that suspended indefinitely his license as a psychologist pending his completion of specific academic and supervised practical training. Dr. Barnes' three assignments of error contend that the board and the court erred in determining that "he misrepresented himself as a clinical psychologist," that the board and the court erred in imposing an indefinite suspension when he *involuntarily* treated a person outside his area of competence, and that the board lacked jurisdiction of the matter by failing to hold a hearing within fifteen days, as Dr. Barnes contends is required by R.C. 119.07.

Using the standard of review set forth in *Angelkovski* v. *Buckeye Potato Chips Co.* (1983), 11 Ohio App. 3d 159, 11 OBR 242, 463 N.E. 2d 1280, paragraph three of the syllabus, we find no abuse of discretion by the court of common pleas; the board's order is supported by reliable, probative, and substantial evidence and is in accordance with law. We affirm.

## I

Three charges were made against Dr. Barnes for violations of R.C. 4732.17(E) and (G) and certain provisions of the Ohio Administrative Code, stemming from his treatment of Ms. A. Justine Rainwater between July 14, 1983 and September 20, 1983. They may be briefly summarized as follows: (1) Dr. Barnes visited Ms. Rainwater's home on September 13, 1983, allegedly for therapeutic purposes, and while there, hugged her, attempted to kiss her, asked to examine her buttock (which she had slashed with a razor), lowered her pants and sought to examine the self-inflicted wounds manually; (2) Dr. Barnes completed a two-page "Psychological Notes" form containing, among other things, sections on presenting problems, personal history, behavioral observation, and diagnoses, and signed the form as "Clinical Psychologist"; and (3) Dr. Barnes attempted to treat Ms. Rainwater for psychological problems at a level of pathology exceeding both his training and his abilities.

At Dr. Barnes' written request, pursuant to R.C. 119.07, the board scheduled a hearing on these charges for April 27, 1984 (that is, within fifteen days of receipt of his request), and at the same time "continued" the hearing until Friday, June 15, 1984. Counsel for Dr. Barnes protested the continuance at the commencement of the board hearing, but his protest was overruled.

The board's findings of fact, conclusions of law, and order, issued July 6, 1984, held that Dr. Barnes had violated the statutes and the regulations as alleged in charges two and three, but, having found that it was not possible to determine with accuracy the facts surrounding the alleged violations in the home visit, the board dismissed charge one.

## II

The record reveals that, in August 1974, the board issued to Dr. Barnes a license as a psychologist under R.C. Chapter 4732. His degrees included a bachelor of science degree in social studies and history, a master's degree in guidance and counseling, a master's degree in history, and a doctorate in guidance and counseling with a minor in psychology. His work experience included employment with the public schools, an adult education center, the Cleveland

Avenue Clinic (in Columbus), Doctors West Hospital and United Health Plan. In his 1982 application for renewal of license, he noted his competency as being in "counseling." We find a total absence of any evidence of academic work or supervised internship in the direct treatment of individuals with psychological problems.

The board's record discloses that Ms. Rainwater picked Dr. Barnes' name out of the Columbus phone book when she was searching around for a new and different professional for help with her emotional problems. At the conclusion of their first interview, Dr. Barnes completed and signed a two-page form entitled "Psychological Notes" on which he wrote his conclusions about her problems, personal history, behavioral observations, global intelligence, sensorium, affect, memory, "evidence of OBS [sic]," treatment plan/referral, psychological testing and diagnoses. The section entitled "Diagnoses" was completed with the phrases "anorexia nervosa," "panic disorder," and "obessive [sic] compulsive disorder." Under his signature was typed his name, his academic degree, and the phrase "Clinical Psychologist." Dr. Barnes conceded that his employer and other physicians might see the report.

Dr. Barnes' attempted treatment was counterproductive. Ms. Rainwater testified that, during the sixty-eight days of Dr. Barnes' treatment, she became more confused, some of her symptoms intensified, she felt sexual pressure from Dr. Barnes, and at the end, "I was so upset that I knew I needed help to get over what Dr. Barnes had done." Several times during the board's proceedings, Dr. Barnes admitted that the complexity of Ms. Rainwater's problems were outside the scope of his competency. He was beyond his depth and he knew it. He maintained, however, that he attempted to refer her to other professionals, one way or another, and that she would have none of it.

In its findings of fact, conclusions of law, and order, the board found that Dr. Barnes had no academic training in psychopathology and no formal didactic or practicum training in psychotherapy; it further found that his only practicum work and experience was in school guidance, that he had no supervised experience of a clinical nature under a psychologist, and that he signed his name to case notes over the title "Clinical Psychologist," which "conceivably may have resulted in the physicians employed at [this clinic] viewing him as a Clinical Psychologist." The board also found that part of his diagnosis was unwarranted, he failed to consult with other doctors or psychologists, and, by his own admission, he recognized that he did not adequately assess the client's psychopathology and that he was functioning outside his area of competence.[1] The board's conclusions were that

---

[1] The board's "Findings of Fact" read in full:

"1. The Board finds that this case was properly commenced pursuant to ORC Chapter 119 and concludes that it has jurisdiction.

"2. Based upon the sworn testimony, it was not possible to determine with accuracy the events and intentions relative to Dr. Barnes and the home visit to the client.

"3. Dr. Barnes has had no formal academic training in psychopathology, personality appraisal or the MMPI.

"4. Dr. Barnes had no formal didactic and practicum training in psychotherapy.

"5. The doctoral degree in Guidance and Counseling held by Dr. Barnes (Exhibit 5) indicates only practicum work related to school guidance.

"6. Dr. Barnes was trained as a School Counselor and functioned as a School Counselor prior to licensure.

"7. Dr. Barnes has had no supervised experience of a clinical nature under a psychologist.

charges two and three had been established, and its order was that his license as a psychologist was suspended indefinitely until he completed a specific regime of academic training and supervised internship and passed the national written and oral examination for psychologists.

### III

In his first assignment of error, Dr. Barnes asserts that the board erred in determining that he misrepresented himself as a "clinical psychologist." He claims, first, that term is not found anywhere in R.C. Chapter 4732 or the regulations and is therefore meaningless and, second, there is no evidence this misrepresentation was communicated to any other person or misled anyone to his/her damage. We are not persuaded by either of these two claims.

Dr. Barnes is correct in his assertion

that neither R.C. Chapter 4732 nor the regulations adopted pursuant to that chapter contain a definition of "clinical psychologist" or any provisions for the licensing of a "clinical psychologist." There is, however, a definition of "licensed clinical psychologist" in R.C. 5122.01(I)(1): it is a person who holds a "current valid psychologist license" under R.C. Chapter 4732 and, in addition, meets certain educational requirements and has a minimum (two years or one year, depending on circumstances) "full-time professional experience, * * * in clinical psychological work * * * under the supervision of a psychologist who is licensed or who holds a diploma issued by the American board of professional psychology * * *."[2] These requirements obviously refer to training in the direct treatment of individuals.

We also find in R.C. 4732.23(D),

---

"8. Dr. Barnes' diagnosis of the client as 'Obsessive-Compulsive' seemed to be unwarranted based on the objective and interview data.

"9. Per Board's Exhibit 7, there is no documentation that Dr. Barnes consulted with other doctors or psychologists on the case.

"10. Dr. Barnes, by his own admission, recognized that he did not adequately assess the dynamics of the client.

"11. Dr. Barnes, by his own admission, recognized that with this client he was functioning outside his area of competence.

"12. Dr. Barnes testified that he repeatedly signed his name to case notes over the title 'Clinical Psychologist.' Such action conceivably may have resulted in the physicans employed at Physicans for General Practice viewing him as a Clinical Psychologist and making referrals based on that belief."

[2] R.C. 5122.01(I) reads in full:

"(I) 'Licensed clinical psychologist' means a person who holds a current valid psychologist license issued under section 4732.12 or 4732.15 of the Revised Code, and in addition, meets either of the following criteria:

"(1) Meets the educational require-

ments set forth in division (B) of section 4732.10 of the Revised Code and has a minimum of two years' full-time professional experience, or the equivalent as determined by rule of the state board of psychology, at least one year of which shall be post-doctoral, in clinical psychological work in a public or private hospital or clinic or in private practice, diagnosing and treating problems of mental illness or mental retardation under the supervision of a psychologist who is licensed or who holds a diploma issued by the American board of professional psychology, or whose qualifications are substantially similar to those required for licensure by the state board of psychology when the supervision has occurred prior to enactment of laws governing the practice of psychology;

"(2) Meets the educational requirements set forth in division (B) of section 4732.15 of the Revised Code and has a minimum of four years' full-time professional experience, or the equivalent as determined by rule of the state board of psychology, in clinical psychological work in a public or private hospital or clinic or in private practice, diagnosing and treating problems of mental illness or mental retardation under supervision, as set forth in division (I)(1) of this section."

Ohio Adm. Code 4732-9-01(A)(2)(c) and elsewhere, a differentiation between types of activity in the field of psychology; for instance, there is counseling psychology, industrial/organizational psychology, social psychology, teaching psychology, and experimental or research psychology. Recent Ohio Supreme Court cases refer to "clinical psychologists" as professionals trained in the areas of diagnosis, evaluation and psychotherapy. *State* v. *Jenkins* (1984), 15 Ohio St. 3d 164, 204, 15 OBR 311, 345-346, 473 N.E. 2d 264, 300, certiorari denied (1985), 472 U.S. 1032; *State* v. *Brown* (1983), 5 Ohio St. 3d 133, 135, 5 OBR 266, 268, 449 N.E. 2d 449, 450-451; *State* v. *Harris* (1976), 48 Ohio St. 2d 351, 363, 2 O.O. 3d 472, 479, 359 N.E. 2d 67, 73-74, vacated on other grounds (1978), 438 U.S. 911. See, also, the discussion of an *experimental* psychologist in *State* v. *Buell* (1986), 22 Ohio St. 3d 124, 22 OBR 203, 489 N.E. 2d 795.

We hold that the word "clinical" has the general meaning ascribed to it by common usage. As defined in Webster's Third New International Dictionary (1971) 423, "clinical" means:

"1: of, relating to, or conducted in or as if in a clinic (as a medical clinic): as a: involving or depending on *direct observation of the living patient* (—diagnosis) (—examination) b: observable by clinical inspection (—tuberculosis) c: based on clinical observation (—picture) (—treatment) d: applying objective or standardized methods (as interviews and personality or intelligence tests) to the *description, evaluation, and modifi-*

*cation of human behavior (—psychology)* * * *." (Emphasis added.)

Thus, clinical psychology refers to psychological diagnosis, personality evaluations and treatment on an individual, one-on-one basis by psychotherapy. This is consistent with the board's regulations requiring academic and practical experience and prohibiting the treating of psychological problems "that fall outside the boundaries of [a psychologist's] own competence," Ohio Adm. Code 4732-17-01(B)(1), and with those regulations which define "psychological procedures" that pose "a serious hazard to mental health" (utilization of which is prohibited to the unlicensed by R.C. 4732.23[C]). Ohio Adm. Code 4732-5-03. The common meaning of "clinical," we find, was subsumed in the proceedings before the board in the instant matter and, in particular, in the testimony of the president of the board.[3] We believe Dr. Barnes' own testimony ascribes that same meaning to the term, because it is obvious that he knew and understood that he was "outside the boundaries" of his competence. In brief, "clinical psychologist" has a clear, definite meaning in the field of psychology.

Turning to the matter of "misrepresentation," we hold that, in the regulation of a profession (such as psychology), a violation of a rule against "misrepresentation" can be established by the actions (and in some circumstances, the inactions) of a professional without the necessity of demonstrating that any other person (patient, client, customer, or other professional) has been misled to his/her damage. We are not dealing with contract or tort law where misrepresen-

---

[3] Dr. Vytautus J. Bieliauskas, president of the board, not sitting as a member in this hearing but testifying as a witness, remarked in answer to a question from a member of the board:

"MEMBER WENDT: Would you please elaborate on what you think is the ap-

propriate academic qualifications to do individual psychotherapy?

"THE WITNESS: Individuals should have training in clinical psychology. Actually, training in psychopathology, personality theory, in testing and evaluation and so on, and also, training in psychotherapy and supervised experience."

tations must be shown to have reasonably led to the mistaken reliance of another party or parties. We are examining the authority of the state to regulate a profession for the protection of the public. The profession of psychology is not unlike the legal profession in the importance of its relationship with its clientele, which is drawn from the general public. Just as the legal profession is regulated by the Supreme Court, from the needed educational requirements and testing through the entire practice of law, by means of the Supreme Court Rules for the Government of the Bar of Ohio and the Code of Professional Responsibility, the General Assembly has provided for the regulation of the profession of psychology through R.C. Chapter 4732 and the regulations adopted thereunder.

One of the obvious purposes of the regulation of professions is to prevent damage from misrepresentations about a professional's competence before any person in the general public is damaged. It is preventive justice rather than retributive justice. See Canon 6 of the Code of Professional Responsibility, "A Lawyer Should Represent a Client Competently," and EC 6-3 and DR 6-101 thereunder; compare with R.C. 4732.17 and 4732.21, and Ohio Adm. Code Chapter 4732-17. The claim of special professional status (that is, the "holding out" itself) is the harm to be avoided.

There was a misrepresentation in the instant case. We hold that the board did not err in concluding that, contrary to the statute prohibiting violation of a board rule of professional conduct, R.C. 4732.17(G), Dr. Barnes violated Ohio Adm. Code 4732-17-01(A)(1)(a), which reads in full:

"(A) Negligence.

"(1) Misrepresentation. A psychologist or school psychologist shall not misrepresent his own professional qualifications, affiliations, and purposes, nor those of the institutions and organizations with which he is associated. The following is a list of misrepresentations; however, said list is not all-inclusive:

"(a) A psychologist or school psychologist shall not claim either directly or by implication professional qualifications that differ from his actual qualifications, including use of a degree or title which is not relevant to his psychological training or which is issued by an educational institution not meeting accreditation standards. He shall not misrepresent his affiliation with any institution, organization, or individual, nor lead others to assume he has affiliations that he does not have. A psychologist or school psychologist is responsible for correcting a client or public media who misrepresent his professional qualifications or affiliations, if he has knowledge of his misrepresentation."

The first assignment of error has no merit.

## IV

In his second assignment of error, Dr. Barnes contends that his treatment of Ms. Rainwater outside his area of competence was involuntary because she refused to be referred to other professionals and that the suspension of his license was too harsh a penalty. We do not agree with this view of the administrative proceeding.

While Dr. Barnes' testimony was that Ms. Rainwater resisted any attempt to refer her for other professional assistance, she testified to the contrary that she felt "pressured" by his behavior. We find reliable, probative, and substantial evidence supporting the board's conclusions that Dr. Barnes knew he "did not adequately assess the dynamics of the client" and "was functioning outside his area of competence," all without being forced to do so. His failures in these two respects violated the clear mandate of the board's regulation, which requires (1) that a

psychologist not offer services or use techniques that fail to meet professional standards established in his field, and (2) that, when faced with problems that fall outside the boundaries of his own competence, a psychologist will obtain help from other professionals. Ohio Adm. Code 4732-17-01(B)(1) and (2).[4]

What Dr. Barnes now claims as an excuse is precisely what the regulation prohibits: he allowed himself to be maneuvered into a position where he felt he could not refer his client to, or consult with, professionals who had the necessary skill and experience to treat the client.

We cannot say that Dr. Barnes' indefinite suspension from the practice of psychology, until he has training and experience meeting professional standards and is tested in that respect, is contrary to law. The trial court did not abuse its discretion in affirming the board's order.

## V

The third assignment of error contends that the board lacked jurisdiction "in the matter" because it failed to hold the hearing requested by Dr. Barnes within fifteen days after he requested it, relying on that sentence in R.C. 119.07 which requires the hearing to be held within that time.[5]

Dr. Barnes' letter requesting a hearing was received by the board on April 13, 1984. Five days later, the board responded as follows:

"Pursuant to the requirements of Chapter 119, Ohio Revised Code, the hearing has been set for Friday, April 27, 1984 at 10:00 a.m. However, it is being continued until Friday, June 15, 1984 at 1:00 p.m. The site of the hearing will be Conference Room 501, 65 South Front Street, Columbus, Ohio."

R.C. 119.09 contains the following sentence:

"An agency may postpone or continue any adjudication hearing upon the application of any party or upon its own motion."

This authority to continue a hearing on the board's own motion must be read *in pari materia* with the fifteen-day deadline in R.C. 119.07, because R.C. 119.06 through 119.10 combine to set forth in detail the administrative procedures for the suspension or revocation of state licenses. *State, ex rel. Kendrick,*

---

[4] Ohio Adm. Code 4732-17-01(B)(1) and (2) read in full:

"(B) Competence.

"(1) A psychologist or school psychologist recognizes the boundaries of his competence and the limitations of his techniques and shall not offer services or use techniques that fail to meet professional standards established in particular fields. The psychologist or school psychologist who engages in practice assists his client in obtaining professional help for all important aspects of his problem that fall outside the boundaries of his own competence. This principle requires, for example, that provision be made for the diagnosis and treatment of relevant medical problems and for referral to or consultation with other specialists.

"(2) A psychologist or school psychologist shall exercise sound judgment and care

in determining what constitutes his area(s) of competence. A guiding principle is the following: one who undertakes practice in a given specialty area will be held to the standard of care within that specialty while he is practicing in that area."

[5] The pertinent paragraph from R.C. 119.07 reads:

"Whenever a party requests a hearing in accordance with this section and section 119.06 of the Revised Code, the agency shall immediately set the date, time, and place for such hearing and forthwith notify the party thereof. The date set for such hearing shall be within fifteen days, but not earlier than seven days, after the party has requested a hearing, unless otherwise agreed to by both the agency and the party."

v. *Masheter* (1964), 176 Ohio St. 232, 235, 27 O.O. 2d 128, 129-130, 199 N.E. 2d 13, 15. In our judgment, R.C. 119.09 gives the fifteen-day provision of R.C. 119.07 the character of being directory, not mandatory. We hold that the continuance of the instant hearing to June 15, 1984, albeit perfunctory, was within the authority and discretion of the board, *State, ex rel. Columbus Gas & Fuel Co., v. Pub. Util. Comm.* (1930), 122 Ohio St. 473, 172 N.E. 284, and that the board's jurisdiction over the charges against Dr. Barnes was not terminated by failure to hold the hearing within the fifteen-day period referred to in R.C. 119.07. We overrule the third assignment of error.

## VI

Finding no abuse of discretion by the trial court, we overrule the assignments of error, and the judgment of the trial court is affirmed.

*Judgment affirmed.*

MOYER, P.J., and NORRIS, J., concur.

BLACK, J., of the First Appellate District, sitting by assignment in the Tenth Appellate District.