(995 P.2d 896)
No. 80,631
Bruce L. Endorf, *Appellee,* v. David L. Bohlender, M.D.,
*Appellant.*

Opinion filed January 14, 2000.

*Donald N. Peterson, II, Randy J. Troutt, and Lisa Adrian McPherson,* of Kahrs, Nelson, Fanning, Hite & Kellogg, L.L.P., of Wichita, for appellant.

*Derek S. Casey, Andrew W. Hutton, and Anne H. Pankratz,* of Hutton & Hutton, of Wichita, for appellee.

Before JUSTICE SIX, presiding, TERRY L. BULLOCK, District Judge, assigned, and ROBERT W. FAIRCHILD, District Judge, assigned.

SIX, J.: This medical malpractice case focuses on the K.S.A. 60-3412 "actual clinical practice" requirement for standard of care expert testimony.

Rhonda Endorf died after receiving emergency room treatment for a snake bite. Plaintiff, Bruce L. Endorf, Rhonda's husband, individually and as special administrator seeks damages for personal injuries and wrongful death. Plaintiff's petition initially asserted claims against: (1) defendant David Bohlender, M.D., (2) Lynda B. DeArmond, M.D., (3) the Arkansas City Memorial Hospital for the negligence of its employee, Mark Knott, R.N., and (4) Wyeth-Ayerst Laboratories, Inc. (Wyeth). Before trial all defendants except Dr. Bohlender settled with plaintiff.

Dr. Bohlender, while on duty in the Arkansas City hospital emergency room, treated Rhonda Endorf. He appeals from the jury

verdict assessing 31 per cent of the fault to him. (The remaining fault percentages were allocated against Dr. DeArmond, 46 per cent; Nurse Knott, 23 per cent; Wyeth, 0 per cent). Dr. Bohlender contends the district court erroneously admitted expert testimony on the standard of care and denied his directed verdict and post-trial motions. (Dr. Bohlender moved for a directed verdict, judgment notwithstanding the verdict, and a new trial.)

We agree the questioned expert testimony should not have been admitted. Dr. Bohlender is entitled to a new trial. We affirm the district court's rulings on the verdict motions.

### K.S.A. 60-3412, The Statute In Question

K.S.A. 60-3412, which sets forth the standards for qualifying standard of care expert witnesses in medical malpractice actions, provides:

"In any medical malpractice liability action, as defined in K.S.A. 60-3401 and amendments thereto, in which the standard of care given by a practitioner of the healing arts is at issue, no person shall qualify as an expert witness on such issue unless at least 50% of such person's professional time within the two-year period preceding the incident giving rise to the action is devoted to *actual clinical practice* in the same profession in which the defendant is licensed." (Emphasis added.)

In our interpretation of K.S.A. 60-3412, we address the narrow, but important, question of who may give expert testimony on the standard of care in a medical malpractice action. Our interpretation has no bearing on the qualifications of medical experts giving testimony on other issues in a malpractice case.

### FACTS

The critical facts arise from the treatment of Ms. Endorf. The bite was initially examined by Dr. Bohlender, who had never treated a snake bite. He called in the attending physician, Dr. DeArmond. After Dr. DeArmond arrived and evaluated the bite, a decision was made to treat Ms. Endorf with antivenin manufactured by Wyeth. Wyeth includes a package insert with the antivenin that instructs on its use and possible dangers. The potential for a serious allergic reaction to antivenin is substantial. An allergic reaction to the Wyeth antivenin caused Ms. Endorf to go into an anaphylactic shock. Ms. Endorf died because of the allergic reac-

tion. All agree that after Dr. DeArmond arrived, she assumed the care of Ms. Endorf.

## DISCUSSION

At trial, plaintiff presented four expert witness opinions on the applicable standard of care. Two experts, Dr. J. Brad Lichtenhan and Dr. Robert A. Barish, were retained by plaintiff. The other two experts, Dr. Donald B. Kunkle and Dr. Leslie V. Boyer were retained by Wyeth. Dr. Lichtenhan was the only expert witness to testify at trial. Dr. Lichtenhan practices medicine in Austin, Texas. Dr. Bohlender does not object to Dr. Lichtenhan's qualifications under K.S.A. 60-3412. However, he takes issue with the district court's decision to admit the deposition testimony of Drs. Boyer, Kunkle, and Barish. All three experts were primarily critical of Dr. DeArmond but also found fault with Dr. Bohlender as a member of the treating team.

### Timeliness of Bohlender's Objections

An initial question we must address centers on the timing of Dr. Bohlender's objections to the expert testimony. The district court allowed the testimony because it found Dr. Bohlender's objection too late and the 50 per cent rule under K.S.A. 60-3412 arbitrary. The district judge said:

"I am going to admit the deposition testimony, and do it for these reasons; each of those witnesses is listed in the pretrial order as plaintiff's witnesses; also listed in [the] pretrial order as admissible exhibits, the curriculum vitae of any witness.

"Now, I don't have time now, and I don't know whether it would do any good if I had an unlimited amount of time, to read the depositions and make any determination on this issue. I doubt that that would be of any assistance. . . . The statute is really to be cut on that exact line, 50 percent seeing patients as a clinician or you don't testify. That seems arbitrary to me. I can't believe that that's a reasonable construction that may complement the legislative intent. I'm not so sure that absolutely strict construction really meets that problem, if that was the objective of the legislature, and I assume it was.

"Here we have a jury waiting, we're a substantial part of the way through the presentation of this evidence. Defendant and everybody else knew these people would be offered, or could be offered by the plaintiff, and that charges the defendant and everybody else with every deficiency that there may be in their qualifications to testify."

The district court was correct in observing that all disputed expert witness depositions were listed in the November 1, 1996, pretrial order. However, the district court did not note that the same pretrial order contained a paragraph listing contested issues of law. One of the many contested issues listed was "[w]hether the plaintiff's or co-defendants' expert witnesses are qualified to testify pursuant to K.S.A. 60-3412." Rulings on the issues of law were reserved by the pretrial order.

A pretrial motion hearing was held on Thursday, August 7, 1997 (the trial commenced the following Tuesday, August 12, 1997). At the hearing the district court and counsel took up a previously filed Wyeth motion relating to the designation of deposition testimony. Dr. Bohlender's counsel suggested,

"[t]hey [the plaintiff] share the knowledge by now who they're going to have as far as depositions so that they give me that by Monday morning so I can react to that."

Plaintiff's counsel agreed.

Dr. Bohlender's counsel said, "I was told [Dr.] Lichtenhan would be live and [Dr.] Barish would be by deposition, but he wasn't going to be brought in. Now I'm told they're only going to use one." Plaintiff's counsel responded, "Plaintiff isn't bringing Dr. Barish because he would give duplicative testimony." The district court instructed the parties to exchange before noon on August 11, 1997, the designation of any deposition testimony to be read to the jury. Dr. Bohlender did not intend to designate any deposition testimony and therefore did not provide designations to plaintiff.

Although counsel said that plaintiff did not intend to make any designations, plaintiff designated portions of the discovery depositions of Drs. Kunkle, Barish, and Boyer. (The designations were made at 3:30 p.m. on August 11, 1997, after the court's noon deadline.)

Jury selection for the trial started on Tuesday, August 12, 1997. Dr. Bohlender lodged his objections to the deposition testimony on August 13 at 8:34 a.m. by filing a response. The jury began hearing evidence that same morning. Dr. Bohlender was not untimely in his K.S.A. 60-3412 objections to the expert testimony.

Actual Clinical Practice

A key phase in K.S.A. 60-3412 is "actual clinical practice." To qualify as a standard of care expert in a medical malpractice action, 60-3412 requires that an expert spend 50 per cent of his or her professional time in the two years preceding the incident devoted to "actual clinical practice."

Dr. Bohlender asserts the district court's admission of the three expert witness depositions was in violation of K.S.A. 60-3412. Plaintiff frames the question as whether the district court, within its discretion, found there was an adequate foundation for the admission of the expert testimony.

Dr. Bohlender's argument is that the 50 per cent "actual clinical practice" requirement means expert witnesses must spend at least half of their professional time engaged in patient care. Plaintiff contends that the legislature did not intend to create such an arbitrary dividing line. He reasons that the legislature sought to preclude "professional witnesses" from testifying, and as long as his experts are not "professional witnesses," they may testify.

Because the district court's decision to admit the expert testimony is based upon an interpretation of K.S.A. 60-3412, we have de novo review. See *Glassman v. Costello*, 267 Kan. 509, 516-17, 986 P.2d 1050 (1999) (discussing standard of review applicable to a K.S.A. 60-3412 dispute).

The legislature adopted K.S.A. 60-3412 in 1986 when it undertook to reform medical malpractice litigation in Kansas. See L. 1986, ch. 229, §§ 1-52. The Supreme Court has discussed K.S.A. 60-3412 in three cases. The first, *Wisker v. Hart*, 244 Kan. 36, 766 P.2d 168 (1988), held that K.S.A. 1987 Supp. 60-3412 was intended to prevent the use of "professional witnesses" in medical malpractice actions. 244 Kan. at 43. *Wisker* rejected the argument that a K.S.A. 60-3412 standard of care expert must practice in the same specialty as the defending physician. 244 Kan. at 44. The second is *Tompkins v. Bise*, 259 Kan. 39, 910 P.2d 185 (1996). *Tompkins* concerned the application of the term "same profession" in K.S.A. 60-3412. *Tompkins* held that a dentist who was qualified to diagnose and treat the injury at issue could testify as to the standard of

care of the physician defendant. 259 Kan. at 49. The third is *Glassman,* 267 Kan. 509. Citing *Wisker, Glassman* reversed a district court decision refusing to allow practicing pathologists to testify on the standard of care for an obstetrician. 267 Kan. at 519. The Supreme Court has consistently rejected the notion that physicians may testify only in the area of their professional specialty. See *Glassman,* 267 Kan. at 519; *Wisker,* 244 Kan. at 44. Neither *Wisker, Tompkins,* nor *Glassman* answer the question presented here.

Plaintiff would have us define "actual clinical practice" here as any medically related activity a physician engages in, except expert review and testimony for civil litigation. Under plaintiff's interpretation, the K.S.A. 60-3412 phrase "actual clinical practice" includes direct patient care, consultation, research, education, mentoring, and administrative activities within the medical profession. Under plaintiff's rationale, a full-time researcher who sees no patients at all could qualify as a standard of care expert witness in a Kansas medical malpractice case. Plaintiff contends that as long as a researcher does not spend more than 50 per cent of his or her time testifying in civil trials, the expert qualifies under K.S.A. 60-3412. We disagree.

A fundamental rule of statutory construction, to which all other rules are subordinate, is that the intent of the legislature governs if that intent can be ascertained. *City of Wichita v. 200 South Broadway,* 253 Kan. 434, 436, 855 P.2d 956 (1993). When a statute is plain and unambiguous, appellate courts will neither speculate as to legislative intent nor read a statute so as to add something not readily found in it. *State v. Alires,* 21 Kan. App. 2d 139, Syl. ¶ 2, 895 P.2d 1267 (1995). The legislature is presumed to have expressed its intent through the language of the statutory scheme it enacted. *In re Marriage of Killman* 264 Kan. 33, 42, 955 P.2d 1228 (1998). Legislative intent may best be determined from the plain meaning of the words used in the statute in light of all the experience available to the law-making body. *Hulme v. Woleslagel,* 208 Kan. 385, 391, 493 P.2d 541 (1972). Our construction should neither add to that which is not readily found in the statute, nor read out what, as a matter of ordinary language, is in it. See *Boatright*

*v. Kansas Racing Com'n*, 251 Kan. 240, Syl. ¶ 7, 834 P.2d 368 (1992).

The legislature, when enacting K.S.A. 60-3412, used the common medical term "clinical practice" in the medical context of medical malpractice litigation. Thus, in interpreting the term "actual clinical practice" we should consider the medical definition of that term.

Stedman's Medical Dictionary 353 (26th ed. 1995) defines "clinical" as:

"1. Relating to the bedside of a patient or to the course of his disease. 2. Denoting the symptoms and course of a disease, as distinguished from the laboratory findings of anatomical changes. 3. Relating to a clinic."

The same source defines "practice" as:

"The exercise of the profession of medicine or one of the allied health professions." Stedman's Medical Dictionary 1417 (26th ed. 1995).

Other sources concur with those definitions. See *e.g.*, Taber's Cyclopedic Medical Dictionary, 368, 1466 (16th ed. 1989). We have no reason to believe the legislature did not intend that those definitions should apply to K.S.A. 60-3412. Statutory words are presumed to have been and should be treated as consciously chosen, with an understanding of their ordinary and common meaning. *International Ass'n of Firefighters v. City of Kansas City*, 264 Kan. 17, 31, 954 P.2d 1079 (1998).

The Ohio Court of Appeals, in a case concerning the meaning of the phrase "clinical psychologist," relied upon the general meaning ascribed to "clinical" by common usage. *In re Barnes*, 31 Ohio App. 3d 201, 510 N.E. 2d 392 (1986). *Barnes* looked to Webster's Third New International Dictionary 423 (1971), for the definition of "clinical":

" '1: of, relating to, or conducted in or as if in a clinic (as a medical clinic): as a: involving or depending on direct observation of the living patient (—diagnosis) (—examination) b: observable by clinical inspection (—tuberculosis) c: based on clinical observation (—picture) (—treatment) d: applying objective or standardized methods (as interviews and personality or intelligence tests) to the description, evaluation, and modification of human behavior (—psychology)°°°.' " 31 Ohio App. 3d at 205.

The Kansas Legislature has used "clinical" many times in health care legislation. A legislative distinction between "clinical" on one hand and "administrative," "educational," "research," and "theoretical" on the other is gleaned from a review of selected statutes. For example:

(A)  In defining active anesthesia practice, " 'active anesthesia practice' means clinical practice *and* anesthesia related administration, educational and research activities." (Emphasis added.) K.S.A. 1998 Supp. 65-1151(f).

(B)  In establishing the subject matter for a license to practice dentistry, "the examination shall be *both theoretical and clinical,* and shall thoroughly test the qualifications of each applicant to practice dentistry." (Emphasis added.) K.S.A. 65-1428(a).

(C)  In setting the qualifications to practice optometry, "[a]ll persons before taking the examination required by the board to be certified as a diagnostic and therapeutic licensee shall submit evidence satisfactory to the board of having successfully completed a course approved by the board in *didactic education* and *clinical training* in the examination, diagnosis and treatment of conditions of the human eye and its adnexae, totaling at least 100 hours. (Emphasis added.) K.S.A. 1998 Supp. 65-1505(c). ("Didactic" means "instruction by lectures and by use of texts as opposed to clinical or bedside teaching of medicine." Taber's Cyclopedic Medical Dictionary 500 [16th ed. 1989]).

(D)  Each applicant for a license as a professional counselor, shall furnish evidence that the applicant "has received a minimum of 200 hours of supervision including (i) 100 hours of *administrative supervision* regarding general professional function, *and (ii) 100 hours of clinical supervision regarding delivery of direct client contact services* with no more than 50 hours conducted as group supervision and no less than 50 hours conducted as individual supervision and no less than 4 hours of clinical supervision contact monthly." (Emphasis added.) K.S.A. 1998 Supp. 65-5804(b)(3)(B).

(E)  In authorizing the Board of Regents to conduct clinical work in its medical course at the University of Kansas School of Medicine, "[t]he board of regents is hereby authorized to conduct, without expense to the state, such *clinical work* in connection with

its medical course as may be feasible *at the various state hospitals affording clinical advantages,* and at such other places in the state of Kansas as may in the judgment of the board of regents seem advisable." (Emphasis added.) K.S.A. 76-315.

These legislative uses of the term "clinical" support Dr. Bohlender's contention.

Many state legislatures have acted to restrict the qualifications of experts in medical malpractice actions. See 4 Louisell & Williams, Medical Malpractice ¶ 29.02 (1999). "A statute may limit expert witnesses to their field of specialty, or require specific familiarity with practices in the locality in question or a similar community. Other statutes require that a witness spend a certain amount of time in clinical practice." 4 Louisell & Williams at ¶ 29.02. Our legislature chose the last of these alternatives when it enacted K.S.A. 60-3412. See *Tompkins* for a legislative history discussion. 259 Kan. at 48-49.

The legislative aim of K.S.A. 60-3412 was to exclude professional witnesses. *Wisker,* 244 Kan. at 43. *Wisker* said: "K.S.A. 1987 Supp. 60-3412 is intended to prevent the use of 'professional witnesses.' *That is, practitioners of healing arts who spend less than 50 percent of their professional time in actual clinical practice in their profession are considered to be 'professional witnesses' rather than practitioners of their profession."* (Emphasis added.) 244 Kan. at 43-44. Although the legislature rejected a locality rule, it did provide express requirements of what an expert witness' qualifications must be in a medical malpractice action. See *Tompkins,* 259 Kan. at 48-49.

If we adopt plaintiff's position, we ignore the express language of K.S.A. 60-3412. Plaintiff's interpretation characterizes "actual clinical practice" as surplusage. The cited medical definitions suggest that the medical community does not define "clinical practice" as plaintiff would have us define the phrase. Plaintiff's definition presumes that the legislature did not understand the common medical meaning of the term "clinical practice" or consider the term an essential component for standard of care testimony. Those presumptions lack support. We note plaintiff qualified his live

expert, Dr. Lichtenhan, by eliciting testimony that the doctor spent 100 per cent of his professional time in "hands-on patient care."

When construing a statute, we are not justified in disregarding an unambiguous meaning. *Boatright*, 251 Kan. 240, Syl. ¶ 7. If the legislature intended plaintiff's construction of K.S.A. 60-3412, it could have said experts must not spend more than 50 per cent of their time testifying in civil trials.

"Actual clinical practice" means patient care. However, patient care should not be limited to a physical presence or bedside requirement. For example, here, Dr. Bohlender was criticized by Dr. Barish for failing to call Poison Control. Had such a call been placed, the physician in Poison Control advising the emergency room doctor on patient care would be engaged in patient care and thus in actual clinical practice. In this technological age of video teleconferencing, and the like, the practitioner of healing arts advising on, or addressing care for, a distant patient is engaged in actual clinical practice.

Turning to the qualifications of the experts at issue here, plaintiff contends that the record contains ample evidence to show that the three doctors spend "almost all their professional time in the actual clinical practice of their profession." However, plaintiff provides neither a single quote from the depositions nor a cite from the record to support his claim. Plaintiff does concede that the party offering the testimony carries the burden to establish a foundation for its admissibility.

Of the three doctors at issue, only one answered the question of time spent in clinical practice. Dr. Kunkle admitted he spends only 25 per cent of his time in clinical practice. Dr. Kunkle is a Medical Director at Good Samaritan Medical Center in Phoenix, Arizona, and teaches at the University of Arizona. He has testified approximately six or seven times as an expert witness. Dr. Kunkle's admission that he only spends 25 per cent of his time engaged in clinical practice reveals a conflict between how he, as a doctor, defines that term and how plaintiff would have us define it.

Neither Dr. Boyer nor Dr. Barish was asked during his deposition how much time he spends in actual clinical practice. Dr. Barish is an associate professor at the University of Maryland School of

Medicine and Chief of the Division of Emergency Medicine and D.rector of Emergency Medical Services at the University of Maryland Medical Center. Dr. Barish testified he had been an expert witness about twenty times. Dr. Boyer works as Medical Director at the Arizona Poison and Drug Information Center and teaches pharmacology and toxicology at the University of Arizona. Dr. Boyer said she has testified as an expert witness only three or four other times.

Plaintiff did not meet his burden of showing that the three witnesses presented as experts were qualified under K.S.A. 60-3412 to give testimony on the standard of care.

We now address the impact of this inadmissible evidence at trial. The question is whether Dr. Bohlender suffered prejudice as a result of its admission. See *Wisker,* 244 Kan. at 44; *Franklin v. Northwest Drilling Co., Inc.,* 215 Kan. 304, 314, 524 P.2d 1194 (1974).

Only Dr. Barish directly criticized Dr. Bohlender. Dr. Barish opined that Dr. Bohlender's failure to call Poison Control fell below the standard of care. Dr. Boyer said that Dr. Bohlender shared responsibility for Ms. Endorf's treatment, but to a lesser extent than Dr. DeArmond. The three experts were mostly critical of Dr. DeArmond. As experts for Wyeth, the crux of Dr. Kunkle's and Dr. Boyer's opinions was that Wyeth had no responsibility for Ms. Endorf's death. It would appear that the jury may have relied to a degree on this testimony, as it found Wyeth without fault.

The jury had to apportion fault among Knott, DeArmond, Bohlender, and Wyeth. The inadmissible expert testimony went directly to the issue of fault. We reason it is impossible to know to what extent the jury relied on the inadmissible testimony in assessing fault to Dr. Bohlender. We believe it is equally impossible to conclude that there was no prejudice to Dr. Bohlender.

## The Verdict Motions

Dr. Bohlender next argues that the district court erred in denying his motions for relief from the jury's verdict. We disagree. When reviewing a district court's denial of a motion for directed verdict or for judgment notwithstanding the verdict, we apply the

same standard that the district court applied. We must resolve all facts and inferences to be drawn from the evidence in favor of the party against whom the ruling is sought. Where reasonable minds could reach different conclusions based on the evidence the motion must be denied and the matter submitted to the jury. *Turner v. Halliburton Co.*, 240 Kan 1, 7, 722 P.2d 1106 (1986).

Dr. Bohlender's argument centers on Dr. Lichtenhan's standard of care testimony. He argues that Dr. Lichtenhan's testimony was without an adequate factual foundation, and opinions without such a foundation may not sustain a jury verdict. (Citing *Lollis v. Superior Sales Co.*, 224 Kan. 251, 580 P.2d 423 [1978].)

Dr. Lichtenhan opined that Bohlender's treatment of Ms. Endorf fell below the standard of care in several respects, specifically by: (1) ordering the test dose subcutaneously rather than transdermally; (2) ordering Benadryl after the test dose, but not specifying how long to wait before giving it; (3) failing to dilute the antivenin beyond a 1:1 ratio; (4) giving the antivenin too soon after the test dose; and (5) giving the antivenin at too fast a rate. According to Dr. Bohlender, all but one of Dr. Lichtenhan's criticisms rested upon the assumption that Dr. Bohlender's written orders were carried out. Dr. Lichtenhan admitted on cross-examination that if in fact Dr. Bohlender's written orders were superseded by Dr. DeArmond, and never carried out, he could not make the first four criticisms. If Dr. Bohlender's orders were not carried out, Dr. Lichtenhan had only one criticism of Dr. Bohlender: Dr. Bohlender should have spoken up to prevent the antivenin administration at such a fast rate.

Dr. Bohlender contends that because he, Dr. DeArmond, and Nurse Knott all testified that his orders were not carried out, Dr. Lichtenhan's first four criticisms were without a factual basis. As to the remaining criticism, Dr. Bohlender argues it is insufficient to sustain the jury's verdict. Dr. Lichtenhan admitted that if, as Bruce Endorf testified, the antivenin was injected in 10-15 seconds, there would have been nothing Dr. Bohlender could have done to prevent the outcome.

Dr. Bohlender's argument fails. We are required to view the evidence in the light most favorable to the plaintiff. See *Turner,*

240 Kan. at 6-7. Here, there was conflicting evidence whether Dr. Bohlender's orders were carried out. Although the testimony was that Dr. DeArmond gave verbal orders, those orders were never reduced to writing as required by hospital policy. Dr. DeArmond also countersigned Dr. Bohlender's orders. Thus, contrary to Dr. Bohlender's assertion, the testimony was controverted by documentary evidence. The evidence showed that the only written orders on administering the antivenin were those written by Dr. Bohlender and countersigned by Dr. DeArmond. The question of whether Dr. Bohlender's orders were carried out was a fact in dispute at trial. Our role is not to pass on the credibility of witnesses or resolve factual disputes. See *Bank of Whitewater v. Decker Investments, Inc.,* 238 Kan. 308, Syl. ¶ 4, 710 P.2d 1258 (1985).

Affirmed in part, reversed in part, and remanded for a new trial.