GINGO, APPELLANT, *v.*
STATE MEDICAL BOARD, APPELLEE.

(Nos. 13485 and 13490—Decided
January 11, 1989.)

*Robert W. Blakemore* and *Robert C. Meeker,* for appellant.
*Anthony J. Celebrezze, Jr.,* attorney general, and *Cheryl J. Nester,* for appellee.

BAIRD, P.J. The Ohio State Medical Board appeals and Anthony J. Gingo, M.D., cross-appeals from the order of the trial court which modified the State Medical Board's decision to revoke Dr. Gingo's medical license. We affirm.

On June 11, 1985, the State Medical Board ("board") held a meeting at which time the board agreed to issue a citation letter to Dr. Gingo. Dr. Raush, a member of the board, was assigned to preside over the hearing if Dr. Gingo requested one. By letter dated June 17, 1985, the board notified Dr. Gingo that he potentially violated:

"1. [Former] R.C. 4731.22(B)(10): [']Conviction of a misdemeanor committed in the course of his practice[']; and

"2. R.C. 4731.22(B)(2): [']Failure to use reasonable care discrimination in the administration of drugs, or failure to employ acceptable scientific methods in the selection of drugs or other modalities for treatment of disease.[']"

The board issued the first charge based on an incident where the police had stopped a car driven by a patient of Dr. Gingo for an unrelated traffic offense. In their search of the car, the police discovered an envelope containing amphetamines. The face of the envelope lacked the doctor's name and address. Dr. Gingo's patient indicated to the police that he had received the medication from Dr. Gingo. As a result of Dr. Gingo's omitting to affix his name and address to the envelope, he was convicted of the misdemeanor crime of failing to properly label the medication he had dispensed. The second charge that the board levied against Dr. Gingo stemmed from his purchases of large numbers of dosage units of amphetamines for the years 1980, 1982, 1983 and 1984.

At a September 11, 1985 meeting, the board reviewed additional evidence concerning Dr. Gingo's practice. After reviewing the evidence, the board decided to amend the citation letter to include:

"1. R.C. 4731.22(B)(3): Selling and prescribing, giving away or administering drugs for other than legal and legitimate purposes; and

"2. R.C. 4731.22(B)(6): [']A depar-

ture from, or the failure to conform to, minimal standards of care [of] similar practitioners under the same or similar circumstances, whether or not actual injury to [a] patient is established.[']"

Both of these charges were derived from the doctor's alleged excessive purchases of amphetamines during specific years. At the meeting, Dr. Raush, the hearing examiner assigned to Dr. Gingo's case and a member of the board, excused himself from the meeting during the discussion of the additional evidence and during the voting on amending the citation letter. In addition, the staff attorney who later presided was present during the discussion and vote.

Upon receipt of the citation letter, Dr. Gingo requested a hearing before the board to determine the validity of the charges. Sometime before the actual hearing, the board changed the hearing examiner from Dr. Raush to Lauren Lubow, the staff attorney originally responsible for scheduling case assignments. The hearing took place on December 10, 1985 and December 17, 1985. The evidence adduced at the hearing revealed that Dr. Gingo originally had started his practice as a family practitioner. He later began to specialize in the treatment of obesity. According to the doctor's own testimony as well as the exhibits introduced into evidence, Dr. Gingo had implemented a weight control plan which primarily involved dieting, exercising and the use of anorectics or amphetamines over an extended period of years.

The hearing examiner issued her findings of fact and conclusions of law after the hearing. The facts as determined by the hearing examiner are that Dr. Gingo purchased a total of 1,260,000 dosage units of methamphetamine in 1980, 1982 and 1983, and 50,000 dosage units of phentermine in 1984; that Dr. Gingo was convicted of failing to properly label the drugs he gave to his patients; and that Dr. Gingo routinely used methamphetamine as part of a long-term treatment of obesity. From these facts, the hearing examiner concluded:

"Excessive or otherwise inappropriate dispensing of controlled substances is not an uncommon allegation confronted by this board. However, the matter of Dr. Anthony J. Gingo differs from many drug-related cases, in that it is based primarily on the ordering and dispensing of massive quantities of scheduled stimulants rather than on a patient by patient analysis of dispensing practices.

"Dr. Gingo's ordering of scheduled drugs is nothing short of amazing. In 1983 and 1984, Dr. Gingo's purchases of methamphetamine exceeded even those of hospitals and pharmacies in the state of Ohio. As a methamphetamine purchaser, Dr. Gingo outpaced virtually everyone in the nation in 1984, after having been the second largest purchaser the year before.

"Dr. Gingo's explanation of the role these drugs play in his medical practice only reinforces the magnitude of the problem. By his own admission, Dr. Gingo considers the continuous maintenance of a patient on methamphetamine for ten years, fifteen years, or even a lifetime to be an acceptable practice, so long as a desired weight is maintained. He does not view the habituating capabilities of methamphetamine to be of major importance. Patients are automatically placed on methamphetamine if they are unable to stick with the recommended diet.

"In short, Dr. Gingo's weight loss 'system' is precisely the opposite of what one would expect to find in a program purported to enhance overall good health. In truth, his proposed solution to an admittedly significant problem—obesity—ultimately pro-

motes a far more alarming epidemic: drug misuse and abuse.

"Dr. Gingo's approach to weight control is not unique. As Dr. Jack Davies attests, there are practitioners who believe that the dangers reputedly posed by amphetamines and similar stimulants when used as anorectic agents are greatly exaggerated. Nevertheless, the fact that a relatively small number of physicians endorse a particular course of treatment certainly does not mean that it should be condoned. Even Dr. Louis Lasagna, upon whose findings Dr. Gingo appears to rely extensively, specifies that long-term treatment with amphetamines should be intermittent. Dr. Davies' broader interpretations are unsupported by any participation in clinical or laboratory studies involving amphetamines in the treatment of obese patients. In addition, the position which both Dr. Davies and Dr. Gingo expound not only goes against the manifest weight of scientific evidence, but even contradicts the warnings of the drug manufacturers themselves."

The hearing examiner recommended that Dr. Gingo's license to practice medicine should be revoked. Dr. Gingo timely filed objections to the report. On August 14, 1986, the members of the board voted to confirm Lubow's findings of fact and conclusions of law.

The board issued its decision on August 15, 1986. Dr. Gingo filed a notice of appeal with the Summit County Court of Common Pleas on August 29, 1986. (August 30 was a Saturday; August 31 was a Sunday; and September 1, Monday, was Labor Day.) On September 3, 1986, more than fifteen days after the board's decision was issued, the board stamped as received Dr. Gingo's notice of appeal. Consequently, at the trial court, the board moved to dismiss Dr. Gingo's appeal because it was not filed within the fifteen-day time limit prescribed by R.C. 119.12. The trial court held that the board had constructively received the notice within the fifteen-day time period.

After deciding this jurisdictional issue in favor of Dr. Gingo, the trial court proceeded to hear additional evidence on Dr. Gingo's allegations that he was denied a fair and impartial hearing. As well as the new evidence presented, the trial court had before it a transcript of the hearing held before the board, the exhibits and the briefs of both parties. The trial court found that the hearing was not in accordance with law because it was conducted by the board's attorney and not a board member. Second, the trial court determined that only one of the violations upon which the board formed the basis to revoke the doctor's license was supported by reliable, probative and substantial evidence. The court thereupon modified the order of the board. The trial court upheld the violation which stemmed from Dr. Gingo's conviction for failure to properly label his medication. Therefore, instead of permanently revoking Dr. Gingo's license, the trial court suspended his license for a fifteen-day period.

The board appeals, and Dr. Gingo cross-appeals the trial court's decision to modify the board's order.

### The Board's Assignment of Error No. I

"The lower court erred as [a] matter of law in failing to dismiss the appeal for lack of jurisdiction, as Gingo had failed to timely file his notice of appeal * * *."

The board contends that the trial court was without jurisdiction to review the board's decision because Dr. Gingo failed to file his notice of appeal with the board within the statutory time limitation of fifteen days. R.C. 119.12 provides in pertinent part that:

"Any party desiring to appeal shall file a notice of appeal with the agency setting forth the order appealed from and the grounds of his appeal. A copy of such notice of appeal shall also be filed by the appellant with the court. Unless otherwise provided by law relating to a particular agency, such notices of appeal shall be filed within fifteen days after the mailing of the notice of the agency's order as provided in this section. * * *"

Courts have construed the statutory language "shall be filed within fifteen days" to mean actual receipt of the notice of appeal by the agency. *Boomershine* v. *Bur. of Motor Vehicles* (1973), 39 Ohio Misc. 103, 104, 68 O.O. 2d 267, 268, 315 N.E. 2d 842, 843. The board claims it actually received the notice of appeal one day later than allowed by statute as evidenced by the time stamp placed upon the notice by the board. To bolster its contention, the board refers to cases which stand for the proposition that the time limitation is mandatory and, if not complied with, the trial court is without jurisdiction to hear the case. See, *e.g.*, *Zier* v. *Bur. of Unemp. Comp.* (1949), 151 Ohio St. 123, 125, 38 O.O. 573, 574, 84 N.E. 2d 746, 747; *Hart* v. *Bd. of Liquor Control* (1953), 96 Ohio App. 128, 54 O.O. 217, 121 N.E. 2d 257. In contrast, Dr. Gingo argues that a presumption of timely delivery arose when he placed the notice of appeal in the mail within sufficient amount of time for the board to have received it before the time to file the appeal had expired. In support of his argument, Dr. Gingo relies on the Supreme Court case of *Dudukovich* v. *Lorain Metropolitan Housing Auth.* (1979), 58 Ohio St. 2d 202, 12 O.O. 3d 198, 389 N.E. 2d 1113.

In *Dudukovich,* a former housing inspector appealed the decision of the housing authority to fire her. She filed a notice of appeal with the trial court and sent a copy of the notice to the housing authority by certified mail.

The housing authority contended that the trial court had no power to review the agency's decision because the notice of appeal was not timely filed with the agency. The Ohio Supreme Court held that the notice of appeal was presumptively timely delivered when it was shown to have been sent within sufficient time for it to have arrived at the agency before the expiration of the applicable time limit. *Dudukovich, supra,* at 205, 12 O.O. 3d at 200-201, 389 N.E. 2d at 1115-1116. The court ruled that in the absence of evidence to the contrary, it is presumed that once the notice of appeal timely enters the ordinary course of the mails, the notice will be timely delivered. *Id.* The burden rests on the party contesting jurisdiction to submit proof that the notice of appeal was not timely delivered. *Id.*

In the case *sub judice,* the doctor submitted to the trial court a series of affidavits which showed that if the mail procedures followed their usual and customary course, the notice of appeal should have been available for the board to retrieve from its mail box on September 2, 1986. If the board had picked up the notice of appeal on that date, it would have been timely filed. According to the affidavits before the trial court, the doctor mailed the notice on Friday, August 29, 1986 before 4:30 p.m. If a letter is deposited in the mail in Akron before 4:30 p.m., it will be sorted and dispatched to Columbus no later than 11:30 p.m. that same day. Upon arrival of the mail in Columbus on the following day, the mail is delivered to the board's mailroom in one of two daily deliveries, either 6:00 a.m. or 10:00 a.m. Because September 1, 1986 was Labor Day, the mail was delivered to the board's mailroom on September 2, at either 6:00 a.m. or 10:00 a.m. The board stamped as "received" Dr. Gingo's notice of appeal on September 3, 1986. Dr. Gingo attributes the September 3 time stamp

to the board's habit of neglecting to retrieve its mail from the mailroom on the day it is delivered. In the instant case, all the evidence leads to the conclusion that the notice was mailed in sufficient time so as to cause it to arrive at the board's mailroom on September 2, although it may not have been picked up until September 3. Based on the ordinary mailing procedure of the post office and the facts of this case, a presumption arises that Dr. Gingo's notice of appeal was timely filed.

The board claims that, notwithstanding the *Dudukovich* rationale, its evidence rebutted the presumption of timely filing because its time stamp indicates that notice was filed late. The fact that the board neglects to pick up its mail, added to the fact that the board relies on its own time stamp to evince the date when it receives the notice, denudes the board's claim of any validity. The trial court concluded and, we agree, that the board's stamp on the notice is insufficient to overcome the presumption that the notice of appeal was timely delivered to the board. In so ruling, the trial court stated:

"Other courts have determined that where mail is properly addressed, stamped, and mailed, but is time-stamped as received after the date by which it should normally have been received in the ordinary course of mails, a form of constructive receipt arises and the documents mailed may be deemed timely filed. *Charlson Realty Co.* v. *United States* ([Court of Claims] 1967), 384 F. 2d 434; *Legille* v. *Dann* ([C.A.D.C.] 1976), 544 F. 2d 1. In those cases the agency's time-stamp, even considered along with evidence of regular office procedures, was insufficient to overcome the presumption of timely delivery."

We find that the evidence before the trial court supported its ruling that the notice of appeal was constructively received by the board within the fifteen-day limit set forth in R.C. 119.12. Thus, the first assignment of error is not well-taken.

### The Board's Assignment of Error No. II

"The lower court erred as a matter of law in holding that the use of an attorney hearing examiner by the State Medical Board was not in accordance with law."

The board claims that the hearing was held in accordance with the law because former R.C. 4731.23, read in conjunction with R.C. 119.09, permitted the board to delegate its responsibility in conducting an adjudication hearing to a referee or examiner licensed to practice law in the state of Ohio. Dr. Gingo disagrees with the board's stance. He argues that former R.C. 4731.23, in effect at the time of the hearing, empowered only board members to conduct hearings. Former R.C. 4731.23 read:

"Any investigation, inquiry, or hearing, which the state medical board is empowered to hold or undertake may be held or undertaken by or before any member of the board, and the finding or order of such member shall be deemed to be the order of said board when approved and confirmed by it."

However, R.C. 4731.05 provided (as does present R.C. 4731.05[A]) that all "adjudicative proceedings" of the state medical board should be conducted in accordance with R.C. Chapter 119. Further, R.C. 119.09 specifically allows the agency to delegate its responsibility to preside over an adjudication hearing by appointing a referee or hearing examiner to conduct the hearing. The Administrative Procedure Act, R.C. Chapter 119, requires the examiner to be admitted to the practice of law in the state and possess such additional qualifications as the agency deems necessary. R.C. 119.09.

Dr. Gingo claims that R.C. Chapter 119 does not govern a hearing by the board because such a hearing is not an adjudicatory proceeding within the contemplation of R.C. Chapter 119. Dr. Gingo attempts to add credence to his argument by contending that because current R.C. 4731.23 requires the board to appoint an attorney as the hearing examiner, this provision must have been enacted to specifically counteract the effect of former R.C. 4731.23, which allowed only board members to conduct a hearing. The trial court adopted Dr. Gingo's reasoning and found that his hearing was not in accordance with law because the hearing officer was not a member of the board. We respectfully disagree with the trial court's decision.

A hearing which could result in the revocation or suspension of a doctor's license is a specific type of adjudication contemplated by R.C. Chapter 119. See *Welsh* v. *Ohio State Medical Bd.* (1959), 168 Ohio St. 520, 7 O.O. 2d 389, 156 N.E. 2d 740. Therefore, a hearing to revoke or suspend a doctor's medical license is an adjudication hearing and falls within the purview of R.C. 119.09. Furthermore, the medical board becomes subject to the Administrative Procedure Act, R.C. Chapter 119, by virtue of its licensing function as set forth in R.C. 4731.08. *Ohio State Medical Bd.* v. *Zwick* (1978), 59 Ohio App. 2d 133, 136, 13 O.O. 3d 178, 179, 392 N.E. 2d 1276, 1278. R.C. 119.06 through R.C. 119.10 combine to provide a detailed set of administrative procedures for the suspension or revocation of state licenses such as medical licenses. *In re Barnes* (1986), 31 Ohio App. 3d 201, 31 OBR 470, 510 N.E. 2d 392, paragraph five of the syllabus. The board has the option to either appoint, as a hearing examiner, one of its own members pursuant to R.C. 4731.23 or a qualified attorney pursuant to R.C. 119.09. *Ohio State Medical Bd.* v. *Zwick, supra,* at 138, 13 O.O. 3d at 180-181, 392 N.E. 2d at 1279; *Fiyalko* v. *Ohio State Medical Bd.* (June 13, 1985), Cuyahoga App. Nos. 49524 and 49571, unreported.

The legislative history of current R.C. 4731.23 reveals that House Bill No. 769 was proposed and later enacted in amended form to combat possible due process violations which resulted when a board member took on the dual role of investigator and adjudicator concerning alleged violations committed by a member of the medical profession. Ohio Legislative Service Commission, 116th General Assembly 1985-1986, Analysis of H.B. 769. The present form of R.C. 4731.23 merely makes mandatory that which was once discretionary. According to the current statute, the board must appoint a qualified attorney to preside over the hearing. At the time of Dr. Gingo's hearing, the board could choose between using a board member or an attorney as the hearing officer. The board's choice of an attorney to sit as the hearing officer during Dr. Gingo's hearing was in accordance with law.

Although this court disagrees with the trial court's ruling on this issue, and we believe that Assignment of Error No. II is well-taken, our ruling is merely instructive and does not affect the disposition of the case on appeal. We address this assignment of error to clarify the statutory language of R.C. 4731.23. Thus, our decision does not require a reversal.

The Board's Assignment of
Error No. III

"The lower court erred in holding that the decision of the state medical board was not supported by reliable, probative and substantial evidence as to any of the charges except violation #4."

The trial court found that the

board's order was not supported by reliable, probative and substantial evidence except for violation number four, which was based on Dr. Gingo's conviction for improperly labeling the medication he had dispensed. A court of common pleas must appraise all the evidence and the weight to be given to it. *Univ. of Cincinnati* v. *Conrad* (1980), 63 Ohio St. 2d 108, 110, 17 O.O. 3d 65, 66, 407 N.E. 2d 1265, 1267. If, after such consideration, the court finds that the administrative order is not supported by reliable, probative and substantial evidence and is not in accordance with law, the court may reverse, vacate or modify the order. *Id.* Whether the "order is supported by reliable, probative and substantial evidence essentially is a question of the absence or presence of the requisite quantum of evidence. Although this in essence is a legal question, inevitably it involves a consideration of the evidence, and to a limited extent * * *" permits the common pleas court to substitute its judgment for that of the board. *Id.* at 111, 17 O.O. 3d at 67, 407 N.E. 2d at 1267.

In reviewing the trial court's order, this court will be mindful of its own narrow scope of review. Our function is limited to determining whether the order of the trial court was a product of an abuse of discretion. *Kinney* v. *Dept. of Adm. Serv.* (1984), 14 Ohio App. 3d 33, 14 OBR 37, 469 N.E. 2d 1007, at paragraph one of the syllabus. The trial court abuses its discretion when its decision is so palpably and grossly violative of fact and logic that it evidences a perversity of will and is an exercise not of reason, but of passion or bias. *Huffman* v. *Hair Surgeon, Inc.* (1985), 19 Ohio St. 3d 83, 87, 19 OBR 123, 127, 482 N.E. 2d 1248, 1252.

The first violation charged against Dr. Gingo alleges that he failed to use reasonable care discrimination in the administration of drugs and failed to employ acceptable scientific methods in the selection of drugs or other modalities for the treatment of disease. The trial court found that the record of hearing was devoid of any evidence demonstrating either reasonable or unreasonable discrimination by Dr. Gingo in administering drugs. As set forth in the transcript, Dr. Gingo dispensed amphetamines to a high percentage of his patients. The record also reveals that Dr. Gingo sustained his patients on amphetamines over an extended period of time. Dr. Gingo testified that before he prescribes any medication he conducts preliminary evaluations of all his patients in order to ascertain the type of obesity from which the patient suffers, any allergies the patient has and other medication the patient is taking. The doctor also testified that if he learns his patient has been abusing the medication or has developed side-effects from its use, he will take the patient off the drug. We find the trial court's ruling that the evidence did not support the agency's decision on this violation to be consistent with the dearth of facts present in the record upon which the agency attempted to base its conclusion.

The second violation levied against Dr. Gingo was that he allegedly did not administer drugs for a legal and legitimate therapeutic purpose. The trial court found that the use of amphetamines to treat obesity is a legitimate therapeutic purpose. The board contends that the evidence of Dr. Gingo's purchase of large quantities of amphetamines as well as his long-term plan of maintaining his patients on the drugs supports its finding that the doctor's use of amphetamines lacked a legitimate therapeutic purpose. We find that the trial court's position that the evidence did not support the violation to be consistent with the facts, or lack thereof and, thus, not to be an abuse of discretion.

Finally, Dr. Gingo was charged

with failure to conform to minimal standards of care. The trial court noted that although the board need not present expert testimony on the proper standard of care, there must be some evidence of the standard of care employed by Dr. Gingo. Thus, the trial court concluded that the board had nothing with which to compare the proper standard of care. As set forth in *Arlen* v. *Ohio State Medical Bd.* (1980), 61 Ohio St. 2d 168, 172, 15 O.O. 3d 190, 193, 399 N.E. 2d 1251, 1254, the board acts as its own expert in deciding the minimal standard of care. Keeping this in mind, we agree with the trial court that the record does not provide sufficient evidence to adduce what standard of care Dr. Gingo instituted in his practice. The two factual findings of the board, that Dr. Gingo purchased large dosage units of amphetamines and that he maintained his patients on amphetamines, do not provide a clear picture of the standard of care the doctor implemented. The trial court did not abuse its discretion in holding that violation number three was not supported by reliable, probative and substantial evidence.

The trial court was disturbed by the hearing examiner's conclusions, for they appeared to have been based on her own involvement in curbing the use of amphetamines in certain types of medical treatments and her involvement in gathering information for newspaper articles which dealt with the alleged abuse in the care and treatment of patients by Ohio doctors. We recommend that a hearing officer should separate himself or herself from any possible participation in activities which could call into question his or her objectivity. Furthermore, this court would note that a hearing examiner's presence during the investigatory phases of a proceeding which could result in the revocation or suspension of a medical license raises a question as to whether one charged with the violations received a fair and impartial hearing. The board's assignment of error number three is not well-taken.

Dr. Gingo's Assignment of Error

"The court erred in modifying the order of the State Medical Board after it determined that the order was not 'in accordance with law' as required by R.C. 119.12."

Dr. Gingo claims the trial court erred when it modified the decision of the board. The doctor asserts that upon finding that the board's hearing was not in accordance with law, the trial court was required to vacate the board's order revoking his license. Therefore, the doctor concludes, the trial court's decision that the board's hearing was not in accordance with law makes it impossible for the trial court to uphold the board's order as to the doctor's labeling conviction. Because we find that the use of an attorney hearing examiner was in accordance with law, we must also find that the trial court did not err in modifying the decision of the board by upholding only the charge associated with Dr. Gingo's conviction for failure to label his medication. We affirm the trial court's ruling that Dr. Gingo's license should be suspended for a period of fifteen days.

The board's Assignments of Error Nos. I and III are not well-taken. The board's Assignment of Error No. II is well-taken as herein noted. Dr. Gingo's assignment of error is not well-taken. The judgment of the trial court is affirmed.

*Judgment affirmed.*

CACIOPPO and MILLIGAN, JJ., concur.

JOHN R. MILLIGAN, J., of the Fifth Appellate District, sitting by assignment.