No. 61,090

JEWELL WISKER, an heir at law and on behalf of the heirs of CECIL WISKER, deceased, *Appellant,* v. DILLIS HART, M.D.; MID-AMERICA SURGICAL GROUP, P.A.; and RONALD B. DAVIS, M.D., *Appellees.*

(766 P.2d 168)

Opinion filed December 9, 1988.

*Kenneth L. Ingham,* of Wichita, and *Joel S. Heller,* of Wichita, were on the briefs for appellant.

*James Z. Hernandez,* of Woodard, Blaylock, Hernandez, Pilgreen and Roth, of Wichita, argued the cause, and *Cindy Cleous-Stang,* of the same firm, was with him on the brief for appellee Ronald B. Davis, M.D.

*William Tinker, Jr.,* of McDonald, Tinker, Skaer, Quinn & Herrington, P.A., of Wichita, argued the cause, and *Quentin E. Kurtz,* of the same firm, was with him on the brief for appellee Dillis Hart, M.D.

The opinion of the court was delivered by

McFARLAND, J.: This is a medical malpractice action wherein

the jury found plaintiff's decedent 60 percent at fault. The plaintiff appeals therefrom.

The first issue is whether the verdict is contrary to the evidence.

When a verdict is challenged for insufficiency of evidence or as being contrary to the evidence, it is not the function of this court to weigh the evidence or pass on the credibility of the witnesses. If the evidence, with all reasonable inferences to be drawn therefrom, when considered in the light most favorable to the prevailing party, supports the verdict, it will not be disturbed on appeal. *Tetuan v. A. H. Robins Co.*, 241 Kan. 441, Syl. ¶ 1, 738 P.2d 1210 (1987). See *In re Adoption of F.A.R.*, 242 Kan. 231, Syl. ¶ 2, 747 P.2d 145 (1987); *Long v. Deere & Co.*, 238 Kan. 766, Syl. ¶ 1, 715 P.2d 1023 (1986).

The evidence considered in the light most favorable to the defendants may be summarized as follows:

Cecil Wisker was injured on Saturday, September 1, 1984, in a three-wheel motorcycle accident at a state recreational park in Waynoka, Oklahoma. He was taken to the E. L. Clapper Memorial Medical Center emergency room in Waynoka, where he was seen by Dr. James M. Moody. After examining Wisker and his x rays, Dr. Moody diagnosed Wisker as having a non-displaced fracture of the ninth rib on the right side with contusion of the abdominis rectus muscle. Wisker was released from the hospital with instructions: (1) to apply an ice pack to the lower right rib; (2) to take Norflex, a muscle relaxant; (3) to take Tylenol as needed for pain; (4) to refrain from alcohol; (5) to do no strenuous activity or lifting; (6) to call Dr. Moody if he had any problems or difficulties, or, if Wisker was at home in Wichita, to call his family doctor.

On Monday, September 3, 1984, Wisker returned to Wichita from Oklahoma and told his wife, Jewell Wisker, of the accident, showing her his bruised side. He told her he had two fractured ribs, and had been given pain medicine and told to see his family doctor. The next morning Jewell telephoned Dr. Ronald Davis, the family physician, to have him see Wisker. Dr. Davis examined Wisker that day, diagnosed his injuries as rib fractures, a chest injury, and liver and lung contusions, with resulting right shoulder pain. Wisker was told not to go to work that day. Blood samples were taken. Dr. Davis requested hemoglobin and he-

motocrit readings from the lab to confirm his opinion there was no internal bleeding. The lab results were returned to Dr. Davis on Wednesday, September 5, 1984, and the lowered blood counts indicated the presence of internal bleeding. Wisker returned to Dr. Davis' office. On September 5 his condition appeared to have worsened. Additional blood tests were taken, with orders for immediate processing. After reviewing the results of the latest blood tests and determining Wisker was having internal bleeding, Dr. Davis decided Wisker needed to be hospitalized and that a surgical consultation was necessary. Dr. Davis then consulted with Dr. Dillis Hart, a surgeon, concerning the care and treatment of Wisker.

Dr. Hart examined Wisker that same day, September 5, following Wisker's admission into St. Joseph Medical Center in Wichita. Dr. Hart diagnosed Wisker as having fractured a rib that punctured his liver, causing a loss of blood. In order to determine whether there was any evidence of active bleeding, Dr. Hart had a peritoneal tap done. A peritoneal tap of the left lower quadrant and the right upper quadrant of the peritoneal (abdominal) cavity indicated no continued internal bleeding. Dr. Hart believed the injury had stabilized. The catheter was left in Wisker until September 6, 1984, to determine whether there was any further bleeding. There was not, indicating the blood where Wisker had initially bled had clotted. Dr. Hart saw Wisker several times a day during his hospitalization period, looking for any change which would signal a need to operate. There was none.

On September 7, 1984, Wisker was discharged from the hospital. His condition was, at that time, stable and his liver was not bleeding. Before discharging him, Dr. Hart explained to Wisker that he had undergone a very significant injury to the chest wall, diaphragm, and liver; that he was healing; and that there was no evidence of continuing internal bleeding. Dr. Hart told Wisker he should not involve himself in strenuous activity, and should not be jogging. Neither activity, he said, should be carried out until after a follow-up visit with Dr. Davis or himself in a week or so. Dr. Hart further told Wisker that his injury was the type of injury that could rebleed, and that the healing process could take as long as twelve to eighteen months. Dr. Davis also counselled Wisker at St. Joseph Medical Center before Wisker was dis-

charged. Dr. Davis told Wisker he should not go to work, do any climbing or sports, or lift anything over fifteen pounds. Dr. Davis further told Wisker that rebleeding would occur if he did not restrict these activities.

Both physicians told Wisker to contact them if his condition changed. Wisker's wife, Jewell, also knew she was to contact either Dr. Hart or Dr. Davis if there was any change in Wisker's condition.

Despite the medical admonitions, Cecil Wisker returned to work on Monday, September 10, 1984. He was a mechanic. He worked every workday (September 10-14) of that week. He returned to Dr. Hart's office on Wednesday, September 12, 1984, for more blood tests. His wife testified Wisker's physical condition had improved that week, he was feeling pretty good, and he was eating better. On Thursday, Wisker worked overtime, for a total workday of 10 ½ hours.

On Friday, September 14, 1984, Wisker went to work as usual. About 2:40 p.m., he was manually tightening axle nuts on a truck, using a 10-inch vise grips. He was tightening the seventh nut on one of the truck wheels when he said "Ouch," grabbed his side, stood up, and walked over to another part of the shop and put his head down on a bench. A co-worker, Clyde Clarke, asked Wisker what was wrong and told him he should go back to see his doctor. Instead, Wisker sat in the shop for around 30 minutes, then left the shop. Before leaving, Wisker told his supervisor he was not feeling well and wanted to go home. The supervisor granted Wisker permission to leave.

Wisker arrived home about 3:15 p.m. Jewell Wisker noticed a big change in his condition. He was pale, appeared weak, and was bent over and in distress. Jewell was alarmed by his condition and asked him if he would like her to call a doctor. He declined, took a pain pill, and went to bed. At approximately 6:00 p.m., Cecil Wisker came out of the bedroom and fell on the floor. Jewell called Emergency Medical Service for an ambulance. She also called her sister who, when the ambulance had arrived, called Dr. Davis to tell him they were taking Cecil to the emergency room at St. Joseph Medical Center. This was the first call placed to Dr. Davis concerning Cecil Wisker that day. Dr. Davis testified that he told the caller to go to the emergency room, and that he would notify Dr. Hart and the emergency room

they were en route. Dr. Hart had not been contacted concerning Wisker since his discharge from the hospital on September 7, 1984.

Wisker arrived at the emergency room at approximately 6:30 p.m. He was in shock, had a weak pulse, and had experienced a massive hemorrhage. A peritoneal tap was performed, showing gross (new) blood. He was immediately taken to surgery in order to find and control the bleeding. After evacuating the blood in the abdominal cavity, active bleeding from a small one-inch laceration in the right lobe of the liver was noted. Dr. Hart estimated Wisker's blood loss at, initially, 3,500 to 4,000 cc., and approximately 7,000 cc. of blood loss and replacement by conclusion of the surgery. An amount of 7,000 cc. represents more than Wisker's total body volume of blood. Dr. Hart testified that had Wisker come to the hospital three hours earlier, his chances for survival would have been greatly increased. After several subsequent surgeries necessitated by rebleeding, Wisker died the following day, September 15, 1984.

On March 6, 1985, Jewell Wisker filed this medical malpractice action on her own behalf and on behalf of her two children against Dr. Ronald B. Davis, Dr. Dillis Hart, and Mid-America Surgical Group (for whom Hart was alleged to be an agent), alleging their negligence caused Cecil Wisker's death. There was substantial competent evidence presented at trial that the defendants had not been negligent in their treatment of Mr. Wisker. Contrary evidence was also introduced.

The verdict of the jury found fault as follows:

| | |
|---|---|
| Cecil Wisker | 60% |
| Dr. Moody and the E.L. Clapper Memorial Medical Center | 5% |
| Dr. Dillis Hart | 30% |
| Dr. Ronald Davis | 5% |
| Rental Exchange (Wisker's Employer) | 0% |

Thus, the jury found that 60 percent of the fault was attributable to decedent and 40 percent was the result of medical malpractice. This verdict is not contrary to the evidence under the applicable standard of review previously stated. After suffering a serious injury, decedent ignored the advice of his physicians and engaged in strenuous physical labor. Such activity resulted in a dramatic deterioration of his condition, yet he failed to seek

immediate medical attention as directed to do if such occurred. Instead, decedent went home. Three hours later he collapsed. The time so lost was critical and greatly reduced his chance of surviving.

As an additional aspect of this issue, plaintiff contends that the jury's finding of no damage shows error. The jury had been instructed:

"One whose fault is 50% or more is not entitled to recover damages.

"If you find that the fault of Cecil Wisker is less than 50%, then you shall determine the amount of damages sustained by the plaintiffs . . . ."

Under the instruction the jury was told of the "50 percent rule" and that it need not determine damages if Cecil Wisker was found to be 50 percent or more at fault. We have long held it is not error to advise the jury of the 50 percent rule on comparative negligence cases. *Thomas v. Board of Trustees of Salem Township*, 224 Kan. 539, Syl. ¶ 2, 582 P.2d 271 (1978).

If a plaintiff cannot recover any damages, it would be pointless for a jury to determine damages. This is consistent with PIK Civ. 2d 20.03.

We conclude this issue, in its entirety, is without merit.

For her next issue, plaintiff contends it was error for the trial court to refuse to instruct the jury on punitive damages.

Punitive damages may be awarded whenever the elements of fraud, malice, gross negligence, or oppression mingle in the controversy. *Tetuan v. A. H. Robins Co.*, 241 Kan. at 481. Punitive damages are awarded to punish the wrongdoer for his malicious, vindictive, or willful and wanton invasion of another's rights, with the ultimate purpose being to restrain and deter others from the commission of similar wrongs. *Folks v. Kansas Power & Light Co.*, 243 Kan. 57, Syl. ¶ 6, 755 P.2d 1319 (1988); *Tetuan v. A. H. Robins Co.*, 241 Kan. at 481.

However, a verdict for actual damages is essential to the recovery of punitive damages. *Stevens v. Jayhawk Realty Co.*, 236 Kan. 90, 91, 689 P.2d 786 (1984); *Lantz v. City of Lawrence*, 232 Kan. 492, 499-500, 657 P.2d 539 (1983); *Traylor v. Wachter*, 227 Kan. 221, Syl. ¶ 4, 607 P.2d 1094 (1980).

In *Cox v. Kansas Gas and Elec. Co.*, 630 F. Supp. 95 (D. Kan. 1986), a similar claim was made, and it was held:

"In any event, we note that the issue of punitive damages is moot. Because the jury found plaintiff to be sixty percent at fault, plaintiff was not entitled to recover

actual damages. K.S.A. 60-258a. Kansas law is quite clear that a plaintiff must establish a right to recover actual damages before punitive damages may be awarded. *Lantz v. City of Lawrence*, 232 Kan. 492, 657 P.2d 539 (1983)." 630 F. Supp. at 101.

Inasmuch as the jury herein found Cecil Wisker to be 60 percent at fault, thereby precluding the award of actual damages under K.S.A. 1987 Supp. 60-258a, it follows, under the cited precedents, that punitive damages could not be awarded, rendering this issue moot. Even if considered on the merits, it would be extremely difficult to find any evidence in the record of more than ordinary negligence on the part of defendant physicians, as opposed to gross negligence, such as to justify submission of a claim for punitive damages.

For her third issue, plaintiff contends the trial court erred in excluding certain hearsay testimony which she contends was a dying declaration under K.S.A. 1987 Supp. 60-460(e).

K.S.A. 1987 Supp. 60-460 is the hearsay statute and provides:

"Evidence of a statement which is made other than by a witness while testifying at the hearing, offered to prove the truth of the matter stated, is hearsay evidence and inadmissible except:

. . . .

"(e) *Dying declarations.* A statement by a person unavailable as a witness because of the person's death if the judge finds that it was made (1) voluntarily and in good faith and (2) while the declarant was conscious of the declarant's impending death and believed that there was no hope of recovery."

On September 5, 1984, plaintiff was admitted to the hospital for observation and testing. He was discharged on September 7, 1984. He resumed working on September 10, 1984, (against his physician's advice) and worked until the fatal incident on September 14, 1984. Plaintiff sought to testify to certain statements made by her husband on September 5 on the basis these were dying declarations under 60-460(e). There was no evidence that declarant (decedent) believed at the time of the statement that his death was imminent and that he had no hope of recovery. We conclude this issue is without merit.

For her fourth issue, plaintiff claims error relative to the testimony of Dr. Ernest Schlachter and Dr. Jeffrey Lavigne. The precise issue is difficult to state by virtue of plaintiff's varying designation thereof. In her brief, she claims no error in limiting their testimony but contends the court improperly restricted its consideration thereof by a limiting instruction. In her reply brief,

plaintiff contends the trial court improperly restricted their testimony. No ruling of the trial court limiting such evidence, proffer, or other portions of the record of the testimony are cited to show error. The reply brief, again, asserts the error was in the limiting instruction. The burden is upon the party claiming error to demonstrate to the reviewing court that error occurred. No error has been demonstrated relative to any restriction of these two witnesses' testimony.

We will consider the issue as being confined to whether or not the trial court improperly restricted the jury's consideration of these witnesses' testimony.

Instruction No. 7 stated:

"In determining whether Dr. Hart's learning, skill and conduct fulfill the duties imposed on him by law, you are permitted only to consider the testimony of Dr. Hart, Dr. Charles Jackson and Dr. Jeffrey Lavigne.

"In determining whether Dr. Davis' learning, skill and conduct fulfill the duties imposed on him by law, you are permitted only to consider the testimony of Dr. Davis, Dr. Mark VinZant and Dr. Ernest Schlachter."

In so instructing, the trial court was applying its interpretation of K.S.A. 1987 Supp. 60-3412, which provides:

"In any medical malpractice liability action, as defined in K.S.A. 1985 Supp. 60-3401 and amendments thereto, in which the standard of care given by a practitioner of the healing arts is at issue, no person shall qualify as an expert witness on such issue unless at least 50% of such person's professional time within the two-year period preceding the incident giving rise to the action is devoted to actual clinical practice in the same profession in which the defendant is licensed."

Dr. Schlachter is a general practitioner of medicine. Dr. Lavigne is a surgeon. The trial court construed K.S.A. 1987 Supp. 60-3412 to preclude a surgeon from testifying as to the standard of care applicable to general practitioners and vice-versa. Hence, it limited the jury's consideration of Dr. Lavigne's testimony to the standard of care of defendant Hart, a fellow surgeon, and the jury's consideration of Dr. Schlachter's testimony to the standard of care of defendant Davis, a fellow general practitioner.

Plaintiff contends this was an erroneous construction of the statute. We agree. K.S.A. 1987 Supp. 60-3412 is intended to prevent the use of "professional witnesses." That is, practitioners of healing arts who spend less than 50 percent of their professional time in actual clinical practice in their profession are considered to be "professional witnesses" rather than prac-

titioners of their profession. The statute was not intended to require that only a surgeon could testify as to the standard of care of another surgeon, etc. The weight afforded the testimony of physicians testifying outside their area of professional specialization is a matter to be determined by the jury.

We conclude the restriction of the jury's consideration of the Lavigne and Schlachter testimony was error. However, we are satisfied that no reversible error in this regard has been demonstrated. Dr. Lavigne's testimony as to any deviation of care on the part of Dr. Davis would be cumulative with that of Dr. Schlachter. Dr. Schlachter's testimony as to any deviation in the standard of care of Dr. Hart would be cumulative with that of Dr. Lavigne. The testimony of plaintiff's expert witness surgeon was allowed to be considered against the defendant surgeon. The testimony of plaintiff's expert witness general practitioner was allowed to be considered against the defendant general practitioner.

The plaintiff's other claims of error in the instructions have been considered and are held to be without merit, although not set forth specifically herein.

We turn now to the final and most serious issue raised herein.

The trial court ruled that the collateral source statute, K.S.A. 1987 Supp. 60-3403, was not constitutionally deficient and permitted evidence to be introduced of Social Security and Workers' Compensation benefits. Although not admissible under the statute, plaintiff testified upon direct examination by her own counsel that certain life insurance proceeds had been received. This latter testimony, of course, is not claimed as error.

K.S.A. 1987 Supp. 60-3403 (repealed L. 1988, ch. 222, § 8) provided:

"(a) In any medical malpractice liability action, evidence of the amount of reimbursement or indemnification paid or to be paid to or for the benefit of a claimant under the following shall be admissible: (1) Medical, disability or other insurance coverage except life insurance coverage; or (2) workers' compensation, military service benefit plan, employment wage continuation plan, social welfare benefit program or other benefit plan or program provided by law.

"(b) When evidence of reimbursement or indemnification of a claimant is admitted pursuant to subsection (a), the claimant may present evidence of any amounts paid to secure the right to such reimbursement or indemnification and the extent to which the right to recovery is subject to a lien or subrogation right.

"(c) In determining damages in a medical malpractice action, the trier of fact shall consider: (1) the extent to which damages awarded will duplicate reim-

bursement or indemnification specified in subsection (a); and (2) the extent to which such reimbursement or indemnification is offset by amounts or rights specified in subsection (b).

"(d) the provisions of this section shall apply to any action pending or brought on or after July 1, 1985, regardless of when the cause of action accrued."

The case herein was tried in May of 1987. On July 17, 1987, our opinion in *Farley v. Engelken*, 241 Kan. 663, 740 P.2d 1058 (1987), was filed, holding, in a four to three decision, that said statute was unconstitutional.

In *Harrier v. Gendel*, 242 Kan. 798, 751 P.2d 1038 (1988), evidence of collateral sources was introduced in a medical malpractice action tried prior to the *Farley* decision. In *Gendel*, the jury found no malpractice on the part of the defendants. The majority of this court held that the introduction of such evidence was akin to the introduction of evidence of liability insurance owned by a defendant and hence inherently prejudicial. The judgment was reversed and the case was remanded for a new trial. On the basis of *Gendel*, plaintiff seeks reversal of the judgment and remand of the case.

The *Gendel* defendants argued that, inasmuch as the collateral source evidence went only to determination of damages, any error in the admission of such evidence was harmless as no damages were awarded. The same argument is presented herein. While it is true no fault was found in *Gendel* on the part of defendants and, here, an aggregate 40 percent fault was found on the part of those compared other than the decedent, we do not see this as a legitimate basis of distinction between the two cases as to the result of the introduction of the collateral source evidence. Either the majority opinion in *Gendel* must be applied, which requires a reversal of the judgment herein, or *Gendel* must be overruled.

In *Patterson v. Burt*, 213 Kan. 463, 468, 516 P.2d 975 (1973), we held:

"Where the plaintiff in a personal injury action fails to convince the trier of fact that the defendant is liable, it becomes unnecessary for the trier of fact to resolve the question of damages. Accordingly, it would follow that error, if any, in the manner in which the issue of damages was submitted to the trier of fact becomes immaterial."

Justice Tyler Lockett's dissent in *Gendel* stated:

"I agree with the majority's statement that evidence that a party received collateral source benefits is not admissible in a trial. *Farley v. Engelken,* 241 Kan.

663, 740 P.2d 1058 (1987). Under the instructions, however, the jury was not required to determine the collateral source issue. First, the jury was instructed to determine whether the defendant, Dr. Gendel, was negligent in his treatment of the plaintiff. If the jury found that the defendant was negligent, only then could it consider the fact that the plaintiff received collateral benefits while determining the compensation due the plaintiff.

"The burden is upon the plaintiff to show that jurors disregarded their oath, not as a matter of speculation, but as a demonstrable reality. There must be more than speculation that it was reasonably certain defendant did not receive a fair trial. *State v. Ruebke*, 240 Kan. 493, 498-99, 731 P.2d 842 (1987). Where a party claims error in the admission of certain evidence, there is no presumption of prejudice from the introduction of evidence alone; in addition, the party claiming error must also prove that the error prejudiced the party. *Walters v. Hitchcock*, 237 Kan. 31, 35, 697 P.2d 847 (1985).

"Unlike the majority, I cannot find that as a matter of law the improper introduction of evidence of collateral source benefits into the trial was so inherently prejudicial that it caused the jurors to disregard their oath and the judge's instructions and to decide the case on an improper ground. It is true the plaintiff did not receive a perfect trial, but he did receive a fair trial. I would affirm the judgment." 242 Kan. at 802.

Upon further reflection, we do not believe the analogy between evidence of a defendant's insurance and evidence of collateral sources paid to a plaintiff relied on by the majority in *Gendel* is a valid one. Evidence of a tortfeasor's insurance is excluded by K.S.A. 60-454, which provides:

"Evidence that a person was, at the time a harm was suffered by another, insured wholly or partially against loss arising from liability for that harm is inadmissible as tending to prove negligence or other wrongdoing."

The theory behind the general rule of reversal when a defendant's liability insurance is mentioned is that it distorts the question of liability. The jury is presumed not to view the defendant as the payor of a judgment—but rather the payor is some corporate titan who is in the business of paying judgments in exchange for receiving premiums. Whether this is a valid theory in the modern world where automobile liability insurance is mandatory, broad coverage is common in homeowners' policies, and health care providers are required to be insured is not before us. In any event, that is the basis for reversing when evidence of a defendant's liability insurance is introduced.

Fault was hotly contested throughout the trial herein. The jury apportioned percentage of fault 60-30-5-5-0 among the five parties compared. The jury was instructed that damages were to be determined only if decedent was less than 50 percent at fault. We

have absolutely no basis from which to conclude the jurors disregarded their oaths and the instructions herein. The erroneous admission of the collateral source evidence could have reduced the damages had the jury reached the point of determining damages. It did not reach this point and hence, as in *Patterson v. Burt*, 213 Kan. 463, the error in admitting the collateral source evidence on damages becomes immaterial.

We conclude our contrary holding in *Harrier v. Gendel*, 242 Kan. 798, must be and the same is hereby overruled.

The judgment is affirmed.

ALLEGRUCCI, J., concurring in part and dissenting in part:

Although I concur with most of the majority opinion, I respectfully dissent from Syllabus ¶ 4, and the corresponding portion of the majority opinion.

It would serve no useful purpose to restate what this court held in *Harrier v. Gendel*, 242 Kan. 798, 751 P.2d 1038 (1988). The majority is now overruling *Gendel* before the ink is barely dry. Suffice it to say this court on numerous occasions has found statements by counsel or evidence so prejudicial as to require a mistrial, notwithstanding the admonition to disregard them. This was not a bifurcated trial in which liability was first determined and then the damages, if any. There are jurors who might, based upon the introduction of such evidence, "disregard their oath and the judge's instructions and . . . decide the case on an improper ground." As a trial judge, I once admonished a jury not to take it upon itself to visit the scene of the accident, only to find out later that two of the jurors, upon leaving the courtroom, went directly to the scene to "see for themselves."

The majority finds the analogy of collateral source evidence to evidence of a defendant's insurance as not a valid one. However, in my judgment, the majority chooses to ignore reality and by this decision also overrule, for all practical purposes, our decision in *Farley v. Engelken*, 241 Kan. 663, 740 P.2d 1058 (1987). According to the rationale of the majority, it is difficult, if not impossible, to envision a violation of the collateral source rule that would not be harmless.

I would reverse and remand the case for a new trial. I agree that the plaintiff did not receive a perfect trial; however, in my judgment, neither did he receive a fair trial.

HERD, J., joins the above concurring and dissenting opinion.