No. 78,905

JEROME ALAN GLASSMAN, as Administrator of the Estate of Cathleen Lyn Glassman, Deceased, and JEROME ALAN GLASSMAN, Individually, for and on behalf of JEROME ALAN GLASSMAN, Surviving Spouse of Cathleen Lyn Glassman, and SHAYLYN JANAE GLASSMAN, a Minor, and Surviving Child of Cathleen Lyn Glassman, *Appellants/Cross-Appellees,* v. J. WILLIAM COSTELLO, M.D., *Appellee/Cross-Appellant.*

(986 P.2d 1050)

510

Opinion filed July 9, 1999.

*Fred E. Stoops, Sr.,* of Stoops & Clancy, P.C., of Tulsa, Oklahoma, argued the cause, and *Thomas C. Boone,* of Hays, was with him on the briefs for appellants/cross-appellees.

*Michael R. O'Neal,* of Gilliland & Hayes, P.A., of Hutchinson, argued the cause, and *Tara L. Bragg,* of the same firm, was with him on the briefs for appellee/cross-appellant.

The opinion of the court was delivered by

LARSON, J.: This appeal arises from an anesthesia-related death of a mother during the course of a cesarean section delivery of a healthy child. The mother's survivors sued the anesthetist and the obstetrician. After a settlement was reached with the anesthetist, the claim against the obstetrician was tried to a jury. The jury found the anesthetist 99% at fault and the obstetrician 1% at fault, and awarded damages of $2,007,385.47.

The mother's survivors appeal, contending the trial court erred in refusing to allow testimony as to the standard of medical care by two pathologists. The obstetrician cross-appeals, raising issues of the instructions given as to the duties of surgeons, the questioning of expert witnesses, and the damage award.

*Facts:*

The sad facts of this case reveal the death of Cathleen (Cathy) Glassman on September 11, 1994, during the course of a cesarean section delivery of a healthy baby girl (Shaylyn Glassman).

Cathy had experienced an uneventful pregnancy when labor commenced on September 10, 1994, and she was taken to Hays Medical Center about 8 p.m. Her obstetrician, Dr. Doss, and his backup, Dr. Bauer, were both unavailable, and she was assigned to the obstetrician on call, Dr. J. William Costello.

Dr. Costello checked on Cathy until around 2 a.m., when he determined the labor had not progressed satisfactorily and it was necessary to prepare Cathy for surgery so he could perform a cesarean delivery.

Dr. Costello ordered anesthesia services and Certified Registered Nurse Anesthetist (CRNA) Greg Mahoney was assigned to administer the anesthesia to Cathy. Mahoney discussed the options available with Cathy and her husband, Jerome Glassman. Dr. Costello was not a part of this discussion. A spinal rather than a general anesthetic was chosen and administered by Mahoney.

As the surgery began, the testimony of what happened became inconsistent. Dr. Costello claimed he only nicked the skin with the first incision. Jerome testified the first incision was 4 to 6 inches in length and Cathy said: "I can feel that, you'll have to stop, its not

deadened." Jerome stated a mask was placed over Cathy's face, CRNA Mahoney said "go ahead," and Dr. Costello deepened the original incision. At this point, Jerome was excluded from the operating room.

There was also testimony that Dr. Costello immediately discontinued the surgery. Because the spinal was "spotty," Mahoney determined that additional anesthesia was necessary. A general anesthesia was chosen. Mahoney placed an oxygen mask over Cathy's mouth for 3 to 4 minutes in order to increase the oxygen (oxygenation) to her lungs. Oxygenation raises the content of oxygen in the blood and increases the patient's safety during surgery. Mahoney then administered Curare (a muscle relaxant), Sodium Pentothal (sleeping agent and respiration depressant which makes it impossible for the patient to breath on her own), and Anectine (paralyzes the muscles completely).

According to Dr. Costello, he continued with the surgery and performed a second incision only after Mahoney had administered the general anesthesia and after he asked of Mahoney, "May I start?" and Mahoney told him to proceed. Mahoney said Dr. Costello asked him if the oxygen tube was in place. Mahoney responded, "I said no, it's not. You can go ahead and take the baby." Dr. Costello then continued the surgery.

With the help of nurse Barb King, Mahoney attempted to intubate (place a tube down the trachea) in order to supply Cathy with oxygen during the procedure. A pulse oximeter measuring the oxygen content was attached. The oximeter tones continuously. The tone changes as the level of oxygen in the patient increases or decreases. Mahoney placed the tube. Dr. Costello made a third incision into the abdomen to remove the infant and encountered dark, red blood (an indicator that the patient is not receiving an adequate supply of oxygen). Dr. Costello testified he was unaware the patient had not been properly intubated until he encountered dark, red blood in the patient's abdomen. Furthermore, at that time the tone from the oximeter indicated a sharp decrease in Cathy's oxygen level.

According to nurse King, Mahoney pulled the tube, masked the patient in order to supply her with oxygen, and placed a second

tube. Nurse King was reading the oximeter and testified that Cathy's oxygen level rose and fell several more times. Mahoney testified he tried to maintain Cathy's airway with a bag (squeezing the bag forcing air into her lungs) and an oxygen mask until the baby was delivered at 5:37 a.m.

After the baby was delivered, there were continued efforts to oxygenate Cathy. Mahoney administered additional Anectine and attempted another intubation. Mahoney had difficulty because he encountered airway resistance. Additional assistance from other hospital staff was provided in an attempt to resuscitate Cathy. Their efforts failed and Cathy died due to hypoxia brought about by inadequate anesthetic induction and a failure to intubate prior to initiation of the cesarean section.

This medical malpractice action for the wrongful death of Cathy was brought by Jerome Glassman and on behalf of Shaylyn against Mahoney, Dr. Costello, and others. After settlement or dismissal of all parties except Dr. Costello, the case preceded to a jury trial against him only. The Glassmans contended Dr. Costello was guilty of negligence in (1) failing to direct and monitor nurse Mahoney in the administration of anesthesia, (2) beginning surgery after the failure of a spinal anesthesia administered under his direction, (3) ignoring the oral representation of Mahoney that Cathy was not intubated, and (4) continuing with surgery when he knew, or should have known, that Cathy was inappropriately intubated.

Prior to trial, Dr. Costello moved in limine to prohibit Drs. Noordhoek and Sperry, both pathologists, from testifying as to the standard of care applicable to him, an obstetrician. This motion argued that K.S.A. 60-3412, as interpreted by our court in *Tompkins v. Bise*, 259 Kan. 39, 910 P.2d 185 (1996), disqualified the pathologists because they did not practice in a field similar or related to that of Dr. Costello. Dr. Costello contended our holding in *Wisker v. Hart*, 244 Kan. 36, 766 P.2d 168 (1988), that a physician is allowed to testify about issues outside his or her area of specialization with such testimony subject to cross-examination and arguments as to weight and credibility was limited by the language of *Tompkins*.

The Glassmans argued that both pathologists fully complied with the requirements of K.S.A. 60-3412 in that 50% of their professional time within the 2-year period preceding the incident was devoted to actual clinical practice of the same medical profession in which Dr. Costello is licensed. Both were licensed to practice medicine in Kansas by the Board of Healing Arts, as was Dr. Costello. Their involvement in the case was in their official capacities as Deputy District Coroners under K.S.A. 22a-226(a). The Glassmans stated both doctors had sufficient experience and expertise to render an opinion as to the standard of care of Dr. Costello and the jury was entitled to hear those opinions. They further contended *Tompkins* did not limit the holding of *Wisker*, but rather expanded it to allow a dentist who performed the same procedures and had comparable training as the medical doctor who performed oral and maxillofacial surgery to testify as an expert witness notwithstanding the difference in their profession and the fact they were licensed by different boards.

The trial court granted the motion to prohibit Drs. Sperry and Noordhoek from testifying as to the standard of care applicable to Dr. Costello. The written decision referred to K.S.A. 60-3412, and recognized that in *Wisker*, it was held to be error to prohibit a medical doctor surgeon from testifying as to the standard of care applicable to a medical doctor general practitioner and vice-versa. The trial court did not read *Tompkins* to expand the *Wisker* test as the Glassmans argued but rather focused on whether the witness was engaged in a "similar or related area of practice" as that of the defendant.

The trial court admitted the legislative history of K.S.A. 60-3412 referred to in *Tompkins* revealed that a provision requiring the witness to practice the same specialty as the defendant had been rejected in the final version of the statute. However, the trial court looked to specific *Tompkins* wording and reasoned:

"It is convincing to note two of the emphasized portions of the quotations above, which are clear and unequivocal: 'The definition of "profession" must be related to whether the expert is qualified to perform the procedure at issue and is not limited to the particular licensure of the defendant or the expert' 259 Kan. at 49, and 'The statute requires that an expert witness in a medical malpractice action

be engaged in a similar or related area of practice as the defendant health care provider' 259 Kan. at 50. This plain language is entirely contrary to the position advocated by the plaintiffs."

The trial court further supported its decision that *Tompkins* restricted the holding of *Wisker*, by pointing to the wording of Justice Six's dissent in *Tompkins*, which stated: "By adopting the 'performing a similar medical procedure test' the majority has rewritten K.S.A. 60-3412." 259 Kan. at 50.

Finally, the trial court ruled "before Dr. Sperry and Dr. Noordhoek are allowed to testify concerning the standard of care applicable to Dr. Costello in this case, it must be shown that they have spent at least 50 percent of their professional time in the last two years in a 'similar or related' field as that in which Dr. Costello practiced."

The Glassmans moved at trial to reconsider the earlier ruling on the motion in limine. They argued (1) both physicians clearly spend more than 50% of their time in clinical practice, (2) forensic pathology is related to surgery, (3) the pathologist's opinions were formed as a part of their official duties as District Deputy Coroners, and (4) an anesthesiologist expert of Dr. Costello was expected to give standard of care testimony as to Dr. Costello and this had been mentioned in Dr. Costello's opening statement.

After a full and complete argument, the trial court reaffirmed its previous decision that Drs. Sperry and Noordhoek would not be allowed to offer a standard of care opinion as to the actions of Dr. Costello.

The Glassmans then presented proffers. Dr. Noordhoek would say there was a major miscommunication or noncommunication between Dr. Costello and Mahoney. He would opine Dr. Costello had the duty to know what was going on with the patient before he proceeded with the surgery, and his failure to do so was a deviation from the standard of care of a surgeon.

In the proffer of Dr. Sperry, it was revealed he had written and lectured extensively on the standard of care of physicians, he had lectured on and had a special interest in maternal deaths and specifically the anesthesia and surgical procedures relating thereto, he had probably done more autopsies in this area than 98% of path-

ologists, and he was a licensed Kansas doctor who had given opinions in Kansas as a forensic pathologist 10 or 12 times. It was his opinion that Dr. Costello's actions in this case fell below the standard of care by failing to ensure that Cathy was adequately anesthetized and being ventilated and oxygenated to the extent necessary before initiating the surgical procedure.

In addition to the proffer there was evidence in the record that Dr. Sperry had served as an intern in a hospital for 3 years, had delivered over 200 babies as a family doctor, and giving standard of care opinions was a part and parcel of his job as a forensic pathologist as Deputy Chief Medical Examiner for Fulton County in Atlanta, Georgia. In this case he had been employed as a consultant to Dr. Noordhoek. His hiring was authorized by K.S.A. 22a-233, and his report was contended to be admissible as competent evidence under the wording of K.S.A. 22a-235.

It was also shown that Dr. Noordhoek is a pathologist and coroner licensed to practice medicine and surgery in Kansas. He investigated the death of Cathy in his official capacity as Deputy District Coroner.

After a week-long trial, the jury apportioned 1% of the fault to Dr. Costello and assessed the remaining 99% of the fault against Nurse Mahoney. The $2,007,385.47 damage award was the entire amount requested by the Glassmans. The Glassmans appeal. Dr. Costello cross-appeals.

## GLASSMANS' ISSUE ON APPEAL

*Did the trial court err in refusing to allow Drs. Noordhoek and Sperry, both pathologists, to testify as to the standard of care of Dr. Costello, an obstetrician, in performing a surgical procedure?*

The admissibility of the testimony of an expert witness in a medical malpractice action is primarily governed by K.S.A. 60-3412, although the general statute relating to expert testimony, K.S.A. 60-456, is collaterally involved.

Dr. Costello suggests an abuse of discretion standard of review, relying on *Sterba v. Jay*, 249 Kan. 270, 283, 816 P.2d 379 (1991). The Glassmans argue that interpretation of K.S.A. 60-3412 involves

an issue of law with unlimited appellate review. We held in *Tompkins:*

"Interpretation of a statute is a question of law. An appellate court's review of questions of law is unlimited. *State v. Donlay*, 253 Kan. 132, Syl. ¶ 1, 853 P.2d 680 (1993). . . . It is a fundamental rule of statutory construction, to which all other rules are subordinate, that the intent of the legislature governs if that intent can be ascertained. *City of Wichita v. 200 South Broadway*, 253 Kan. 434, 436, 855 P.2d 956 (1993)." 259 Kan. at 43.

The result we reach in this case is based on our interpretation of K.S.A. 60-3412 and the application of the two Kansas cases we have referred to previously, *Wisker* and *Tompkins.*

K.S.A. 60-3412 provides:

"In any medical malpractice liability action, as defined in K.S.A. 60-3401 and amendments thereto, in which the standard of care given by a practitioner of the healing arts is at issue, no person shall qualify as an expert witness on such issue unless at least 50% of such person's professional time within the two-year period preceding the incident giving rise to the action is devoted to actual clinical practice in the same profession in which the defendant is licensed."

*Wisker* is directly on point with our facts and held:

"K.S.A. 1987 Supp. 60-3412 prevents the use of 'professional witnesses' in medical malpractice actions, all as is more fully discussed in the opinion. The statute was not intended to require that only a physician practicing in a particular specialized area could qualify as an expert witness as to the standard of care of a physician practicing in the same specialized area." 244 Kan. 36, Syl. ¶ 3.

The trial court in *Wisker* construed K.S.A. 1987 Supp. 60-3412 as precluding a surgeon from testifying as to the standard of care applicable to a general practitioner and a general practitioner from testifying as the standard of care applicable to a surgeon. The plaintiff there, as the plaintiffs do here, contended this was an erroneous construction of 60-3412. We unanimously agreed. In reaching the decision set forth above in Syllabus ¶ 3, we pointed out the intent of 60-3412 was to require that a practitioner of the healing arts must spend 50% or more of his or her time in clinical practice (a requirement met by both Drs. Noordhoek and Sperry) to keep from being considered a "professional witness." Critical to the issue we face here, we said:

"The statute was not intended to require that only a surgeon could testify as to the standard of care of another surgeon, etc. The weight afforded the testimony of physicians testifying outside their area of professional specialization is a matter to be determined by the jury." 244 Kan. at 44.

We did not reverse the trial court in *Wisker*, despite an erroneous instruction, because we found the testimony to be cumulative to properly admitted evidence as to the standard of care of both the general practitioners and the surgeon. It should be clear from what we have previously said herein that unless the clear holding of *Wisker* has been materially narrowed by our later decision of *Tompkins*, reversal of the trial court is required and a new trial must be ordered with instructions to allow both pathologists to give their opinions as to the standard of care of Dr. Costello.

The precise issue in *Tompkins* was whether it was erroneous for the trial court to allow a licensed dentist with an additional 3 years of training in oral and maxillofacial surgery to testify as an expert witness in a trial where the defendant was a medical doctor with specialized training in oral and maxillofacial surgery. The trial court reasoned that since both parties were qualified to perform the same procedure, the dentist was qualified as an expert witness.

The Court of Appeals in *Tompkins v. Bise*, 20 Kan. App. 2d 837, 893 P.2d 262 (1995), focused on the wording in K.S.A. 60-3412 relating to the 50% of clinical practice required to be in the same "profession" and held in a 2 to 1 decision that since the dentist and the medical doctor were licensed by separate boards they did not fall under the same "profession." Therefore, the opinion should not have been allowed. The dissent reasoned this construction of the word "profession" was entirely too limited because the dentist spent more than 50% of his actual clinical practice performing the identical surgery that the defendant doctor had performed in the case in issue. 20 Kan. App. 2d at 843-44 (Gernon, J., dissenting).

We granted a petition for review, reversed the Court of Appeals, and affirmed the trial court's admission of the dentist testimony. In doing so, we first held the wording concerning the witness being in the same "profession" should not be limited as to licensure and was related to whether the expert is qualified to perform the procedure at issue. While there is wording in the *Tompkins* opinion

that speaks of the witness being engaged in a similar or related area of practice or performing the procedure at issue, it must be read to explain our approval of testimony by a dentist against a medical doctor because he was qualified based on the circumstances stated. It was never intended to limit admissibility of opinions by experts who are within the same profession or who hold the same basic licensure.

The result of our opinion in *Tompkins* is an expansion, not a limitation, of the individuals who qualify as medical experts. When we refused to construe the "same profession" wording literally, we tied the admissibility of the opinion of the witness outside the defendant's profession to the requirement of expertise in a similar or related area of practice or the witness' qualifications to perform the procedure at issue.

The language of *Tompkins* that the trial court relied on here was necessary to justify the result reached in that case because of the licensure difference. But, it is not to be applied to restrict testimony of experts holding the same licenses. Nor does it limit or alter our holding in *Wisker* that one medical doctor may testify as to the standard of care applicable to another, irrespective of the area of specialization of either.

We noted in *Tompkins* that "the language requiring that the witness practice the same specialty as the defendant was not included in the final version of the statute." 259 Kan. at 49. The result the trial court reached here directly contradicts the teaching of this statement and what our legislative history shows was the intent of K.S.A. 60-3412. The 50% of clinical practice requirement was intended to prohibit the testimony of "professional witnesses." But, the legislative history shows K.S.A. 60-3412 was never intended to require that a medical doctor could only give standard of care opinions where both physicians practiced the same medical specialty.

The trial court committed reversible error in its ruling on the motion in limine and on its reconsideration at trial. The Glassmans were deprived of compelling testimony by Kansas licensed physicians that went to the heart of their case. The trial court is reversed and a new trial is ordered.

## DR. COSTELLO'S ISSUES ON CROSS-APPEAL

Dr. Costello contends the trial court erred in (1) imposing a duty on him to direct the administration of anesthesia by a nurse anesthetist based on the provisions of a nursing statute and in refusing Dr. Costello's requested instruction on vicarious liability, (2) allowing one of the Glassmans' expert medical witnesses to give allegedly new opinions at trial that were not previously disclosed, (3) limiting the testimony of defense expert Steve Preston regarding the changes in the CRNA rules and regulations, and (4) allowing an award of pecuniary damages contrary to the evidence.

In light of our decision to reverse and remand for a new trial, we will not reach or discuss cross-appeal issue (2) because the medical expert's allegedly new opinions should pose no surprise during the retrial and discovery can be supplemented if such is required.

Nor do we consider cross-appeal issue (4) because the amount of damages to be awarded, if any, will be subject to consideration by a new jury, with new evidence presented. The admissibility and sufficiency of the evidence will remain within the control of the trial court.

When a new trial has been ordered, we hesitate to consider issues unless our doing so is likely to assist the trial court and the parties. We also recognize that testimony may vary and the chemistry in the courtroom may be altered, rendering our statements of limited value. With this disclaimer in mind we do, however, believe that cross-appeal issues (1) and (3) are likely to be crucial questions on retrial.  ·

*Did the trial court err in imposing a duty on Dr. Costello to direct the administration of anesthesia by CRNA Mahoney based on the provisions of a nursing statute, and if such duty exists, should his requested instruction on vicarious liability have been given?*

Dr. Costello's first issue in reality encompasses two contentions: First, he argues the trial court erred in concluding an obstetrician performing surgery which requires anesthesia has any duty to direct the administration of anesthesia by a nurse anesthetist. Second, he argues that if such a duty exists, the trial court should have

given his requested instruction on the absence of vicarious liability under K.S.A. 40-3403(h).

We first consider the existence of a duty to direct as it relates to the Glassmans' claim of negligence against Dr. Costello.

The existence of a legal duty, *McGee v. Chalfant*, 248 Kan. 434, Syl. ¶ 3, 806 P.2d 980 (1991), and the interpretation of a statute, *Tompkins v. Bise*, 259 Kan. at 43, are both questions of law over which this court exercises unlimited review.

This case was submitted to the jury on four claims of asserted liability, all as stated in jury instruction No. 2. That instruction, in applicable part, states:

"Plaintiff's contend that the defendant, J. William Costello, M.D., is guilty of the following specific acts of negligence, which plaintiffs contend constituted malpractice:

"a. In failing to direct and monitor nurse Mahoney in the administration of the anesthesia; and

"b. In beginning surgery after the failure of a spinal anesthesia administered under his direction; and

"c. In ignoring the oral representation of Greg Mahoney, CRNA, that decedent was not intubated; and

"d. In continuing with surgery when he knew, or should have known, that Cathleen Lyn Glassman was inappropriately intubated."

The Glassmans' contentions that Dr. Costello owed a duty which he violated center on K.S.A. 65-1158 as it read at the time applicable to this case. The terms of that statute were given to the jury by the trial court as instruction No. 10. That instruction reads:

"(a) Each registered nurse anesthetist shall:

(1) Conduct a pre- and post-anesthesia visit and assessment with appropriate documentation;

(2) develop an anesthesia care plan with the physician or dentist which includes procedures for administration of medications and anesthetic agents;

(3) induce and maintain anesthesia at the required levels;

(4) support life functions during the perioperative period;

(5) recognize and take appropriate action with respect to patient responses during anesthesia;

(6) provide professional observation and management of the patient's emergence from anesthesia;

(7) participate in the life support of the patient;

(8) participate in periodic and joint evaluation of services rendered, including, but not limited to, chart reviews, case reviews, patient evaluation, and outcome of cases statistics; and

(9) participate in the joint reviews and revision of adopted protocols or guidelines.

"(b) A registered nurse anesthetist shall perform duties and functions in an interdependent role as a member of a physician or dentist directed health care team."

Critical to the Glassmans' claims is the wording in subparagraph (b) that the duties and functions of a registered nurse anesthetist are to be performed "in an interdependent role as a member of a physician . . . *directed* health care team." (Emphasis added.)

Dr. Costello's argument that he had no responsibility for the acts of CRNA Mahoney are based on the change in the wording of an administrative regulation and on the 1986 enactment of the Health Care Provider Insurance Availability Act, K.S.A. 40-3401 *et seq.*

K.S.A. 40-3403 pertains to the Health Care Stabilization Fund established for the purpose of paying damages for personal injury or death arising from the negligent rendering or failure to render professional services by health care providers. K.S.A. 40-3403(h) provides:

"A health care provider who is qualified for coverage under the fund shall have no vicarious liability or responsibility for any injury or death arising out of the rendering of or the failure to render professional services inside or outside this state by any other health care provider who is also qualified for coverage under the fund. The provisions of this subsection shall apply to all claims filed on or after [July 1, 1986]."

An administrative regulation, 1992 K.A.R. 28-34-17, entitled "Surgery department," stated in subsection (p) that in hospitals providing surgical care, "[a]ll anesthetics shall be given by a physician, or shall be given under the supervision of a physician." But, this regulation was revoked effective June 28, 1993. It was replaced by two separate regulations, K.A.R. 28-34-17a (Anesthesia services) and K.A.R. 28-34-17b (Surgical services), neither of which includes any provision stating that anesthetics shall be given by a physician or under a physician's supervision. K.A.R. 28-34-17a(d)(1) instead states: "The governing body shall determine the extent of anesthesia services and shall define the degree of collaboration required

for the administration of anesthesia. Certified registered nurse anesthetists shall work in an interdependent role with other practitioners."

Historically, our case law provided that a physician may be vicariously liable for the negligence of other members of the health care team under the so-called "captain of the ship" theory. Under this theory, a physician may be liable solely by reason of his or her relationship to those he or she has a duty or right to control, rather than by reason of any negligence attributable to him or her personally. See *Leiker v. Gafford*, 245 Kan. 325, 355-58, 778 P.2d 823 (1989); *McCullough v. Bethany Med. Center*, 235 Kan. 732, 737-38, 683 P.2d 1258 (1984); *Voss v. Bridwell*, 188 Kan. 643, 364 P.2d 955 (1961).

The adoption of K.S.A. 40-3403(h) abrogates vicarious liability where both health care providers, as defined by K.S.A. 40-3401(f), are covered by the Health Care Stabilization Fund, as was the case here. However, the liability the Glassmans claim is not Dr. Costello's vicarious liability but rather the liability for his individual acts and actions.

In the absence of vicarious liability, Dr. Costello consistently contended in the trial court that he had *no* duty to control, monitor, or supervise CRNA Mahoney or the administration of anesthesia. He stated this in his answer to the petition and later submitted a brief on this issue to the trial court. Dr. Costello argued below, as he does now, that although he would have had such a duty under 1992 K.A.R. 28-34-17, he had no such duty after its 1993 repeal and could not have otherwise been liable under the "captain of the ship" theory after the enactment of K.S.A. 40-3403(h). He claims the repeal of the regulation is evidence that physicians were intended to be relieved of the duty to supervise the administration of anesthesia.

The Glassmans concede Dr. Costello cannot be held vicariously liable for the negligent acts or omissions of CRNA Mahoney. But, the Glassmans argue Dr. Costello had the duty to direct the CRNA, he was obligated to communicate properly with the CRNA, and his obligations were recognized in K.S.A. 65-1158. They also contend that even though K.A.R. 28-34-17(p) was repealed, the duty

is implicit when the surgeon in charge of the health care team is conducting the procedure.

The trial court resolved the issue in a pretrial memorandum decision. The trial court noted that all were in agreement that Dr. Costello could not be held vicariously liable for the acts or omissions of another professional covered by the Fund. It concluded, however, that Dr. Costello could be liable for his own negligent acts or omissions. The trial court believed that K.S.A. 65-1158(b) makes clear that the physician is the one in charge of directing the health care team performing the surgery or procedure, and that, accordingly, Dr. Costello had "some duty" of direction and that it was for the jury to decide whether he negligently breached that duty.

During trial, the trial court expressed the opinion that it was for the jury to decide exactly what degree or quality of direction was required under the circumstances and in light of the respective professions and individual technical duties of the different health care providers. The trial court allowed the parties to argue and introduce evidence to the jury regarding the meaning of "direct" and the extent of this duty of direction.

Both parties make essentially the same arguments on appeal as they did to the trial court.

In *Bair v. Peck*, 248 Kan. 824, 811 P.2d 1176 (1991), we held K.S.A. 1990 Supp. 40-3403(h) was constitutional and that the curtailment of vicarious liability affected a "remedy by due course of law" that was allowed by Sections 1, 5, and 18 of the Bill of Rights of the Kansas Constitution. 248 Kan. at 838, 848. In discussing the legislation giving rise to the issue before the court, we said:

"The Health Care Provider Insurance Availability Act was a comprehensive compulsory insurance plan mandating minimum amounts of malpractice insurance as a condition of providing health care in Kansas. The purposes and details of the Act have been discussed and reviewed in numerous cases and we need not repeat that history here. See *Kansas Malpractice Victims Coalition v. Bell*, 243 Kan. 333, 757 P.2d 251 (1988); *State ex rel. Schneider v. Liggett*, 223 Kan. 610, 576 P.2d 221 (1978). The Act, as originally adopted, consisted of nineteen sections (K.S.A. 1976 Supp. 40-3401 through 40-3419; L. 1976, ch. 231), practically all of which have been amended one or more times or repealed, and four new sections have been added (K.S.A. 40-3420 through 40-3423). Some of the changes in the

original Act have been beneficial to malpractice claimants while others have benefitted medical care providers and/or the Fund." 248 Kan. at 839.

The interrelation of K.S.A. 40-3403(h) with claimed hospital liability as limited by K.S.A. 65-442(b) was the subject of *McVay v. Rich*, 255 Kan. 371, 874 P.2d 641 (1994), but *McVay* is so factually different from our facts that it is of no assistance here.

Dr. Costello cites our decision of *Oberzan v. Smith*, 254 Kan. 846, 869 P.2d 682 (1994), as a case showing that in construing K.S.A. 40-3403(h), we declined to allow a plaintiff to apply the "captain of the ship" doctrine to impose vicarious liability on a physician for the acts of an x-ray technician. This reliance is misplaced.

In *Oberzan*, Davis, an ex-ray technician employed by a hospital, perforated Oberzan's rectum while preparing her for a barium enema. Dr. Smith, a radiologist, was not in the room when the perforation occurred.

We affirmed summary judgment on Dr. Smith's behalf, stating respondeat superior is not applicable to the radiologist because the technician was neither the radiologist's employee nor under his personal control and supervision at the time of the injury, and K.A.R. 28-34-12(c) does not create a legal duty for a designated medical staff physician to personally supervise all activities that occur in a radiology department of a hospital.

We first point out that the incident at issue in *Oberzan* occurred in February 1988, before K.A.R. 28-34-17(p) had been amended. In addition, it did not take place in an operating room. Finally, and most importantly, issue two of the appeal, which was stated as follows:

"[B]ased on K.S.A. 40-3403(h), Smith could not be held vicariously liable for the negligent acts of the x-ray technician (40-3403[h] is a statute abrogating vicarious liability between two health care providers [K.S.A. 40-3401(f)] who are both qualified for coverage under the Health Care Stabilization Fund)"

was not addressed by our opinion. We said: "The health care provider liability abrogation issue need not be reached because Oberzan's contention under issue two relies on Davis being a joint

agent of the hospital and of Smith. Oberzan's reliance is misplaced." 254 Kan. at 847.

As much as we would wish to utilize *Oberzan* in assisting us to answer the question posed here, *Oberzan* is completely different factually, it does not involve an operating room situation, it occurred at a time when the applicable administrative regulations differed, and the issue critical to us in this case was not addressed.

Based on the clear statement of K.S.A. 65-1158, that when anesthesia is being administered by a nurse anesthetist, we are dealing with a "physician . . . directed health care team," we hold the trial court properly allowed the nature and extent of Dr. Costello's duty of direction, under the circumstances and in light of the individual technical duties of the different health care providers, to be a factual issue for the jury to consider in deciding if he negligently breached his duty.

In addition, we hold the trial court correctly ruled that while Dr. Costello is not vicariously liable for the actions of CRNA Mahoney, his argument of no possible liability as the result of K.S.A. 40-3403(h) was properly rejected.

Dr. Costello next argues that because he cannot be vicariously liable for the acts or omissions of CRNA Mahoney under K.S.A. 40-3403(h), the trial court should have given his proposed instruction on that point. The instruction he requested reads as follows:

"A health care provider shall have no responsibility for any injury or death arising out of the rendering or failure to render professional services by any other health care provider. The definition of health care provider includes a physician licensed by the Kansas board of healing arts and a certified registered nurse anesthetist licensed by the Kansas board of nursing."

We note the proposed instruction differs from the exact statutory language by deletion of the reference to the existence of coverage under the Fund, which would not have been appropriate, and states there is "no responsibility," whereas the statute provides there is "no vicarious liability or responsibility."

The Glassmans opposed such an instruction and noted the possibility of the issue becoming even more confused because, if the requested instruction were given, it might necessitate giving jury

instructions on the various aspects of respondeat superior and the differences between direct and vicarious liability.

The trial court concluded vicarious liability was not an issue in the case, expressed concern that introducing an instruction on non-relevant law would tend to confuse the jury, and declined to give the proposed instruction.

Instructions in any given case are to be considered together as a whole, and where they fairly instruct the jury on the law governing a case, and are substantially correct, such that the jury could not reasonably have been misled by them, then the instructions will be approved on appeal. *In re Application of the City of Great Bend for Appointment of Appraisers*, 254 Kan. 699, 713, 869 P.2d 587 (1994).

Based on all of the evidence in the record and specifically the jury's finding of only 1% of the fault to Dr. Costello and 99% of the fault to CRNA Mahoney, it is difficult to conclude anything other than the jury clearly understood the issue it was required to resolve. We can only conclude that under our standard of review the trial court did not improperly refuse to give the requested instruction in this case.

This is not to say that under some factual situations, or possibly with different testimony, that some instruction or direction as to the absence of vicarious liability or responsibility of one health care provider for the acts of another might not be appropriate.

*Did the court err in limiting the testimony of defense expert Preston regarding changes in the CRNA rules and regulations?*

Dr. Costello argues the trial court did not allow his expert, Preston, to testify as to why 1992 K.A.R. 28-34-17 was repealed and replaced with K.A.R. 28-34-17a and K.A.R. 28-34-17b.

Dr. Costello argues that Preston was actively involved in the legislative process of revising regulations and statutes related to nurse anesthetists, and his qualifications and experience provided him with knowledge which could have educated the jury regarding the law.

The qualifications of an expert witness and the admissibility of expert testimony are matters entrusted to the broad discretion of

the trial court. *Simon v. Simon*, 260 Kan. 731, Syl. ¶ 1, 924 P.2d 1255 (1996).

In addition, we point out that it is undisputed that "[w]here trials are by jury, it is the sole province of the court to decide questions of law as distinguished from questions of fact." *Hunter v. Brand*, 186 Kan. 415, 419, 350 P.2d 805 (1960). In 31A Am. Jur. 2d, Expert and Opinion Evidence § 136, pp.143-44, it is stated:

"While witnesses may be permitted, in a proper case, to give an opinion on the ultimate *fact* involved in the case, there is a strong consensus among jurisdictions, amounting to a general rule, that witnesses may not give an opinion on a question of domestic law or on matters which involve questions of law. The fundamental problem with testimony containing a legal conclusion is that conveying the witness' unexpressed, and perhaps erroneous, legal standards to the jury amounts to a usurpation of the court's responsibility to determine the applicable law and to instruct the jury as to that law."

Dr. Costello relies on *In re Marriage of Bunting*, 259 Kan. 404, 912 P.2d 165 (1996), to argue that expert testimony may be allowed for the purpose of educating a jury regarding the legislative and regulatory intent behind particular changes in statutes and regulations. We do not agree.

*Bunting* involved the interpretation of K.S.A. 60-1610(a)(1)(C), a child support issue. We noted that an attorney who helped draft the amendment was allowed to testify before the trial judge as to the purpose behind the amendment. *Bunting* is not to be applied as Dr. Costello argues. First, the propriety of the admission of the testimony was not at issue in *Bunting*. Second, the testimony was presented to the court, which was determining an issue of law. It invades the authority of the court to allow an individual to present testimony to a jury as to what a change in the law was intended to accomplish.

It was not improper for the trial court to refuse to allow Preston to testify to the jury about the specifics of the legislative and regulatory changes. Preston was allowed to testify regarding the interdependent role of the physician and the nurse anesthetist, that the rule as to physician supervision had changed in 1993, and that CRNA Mahoney received all the direction he was entitled to receive. The trial court did not erroneously limit Preston's testimony.

The contentions and arguments of Dr. Costello's cross-appeal are denied.

This case is reversed and remanded for a new trial subject to the comments of this opinion.

SIX, J., concurring.